**UNITED STATES of America,**
**Plaintiff,**

v.

**58TH STREET PLAZA THEATRE, INC., Leo Brecher, Walter Brecher, Vivian Pack and Leo Brecher and Walter Brecher, as Executors of the Estate of Jeannette Brecher, Deceased, Defendants.**

No. 61 Civ. 3312.

United States District Court
S. D. New York.

May 31, 1968.

4. 47 U.S.C. § 402(h).

Robert M. Morgenthau, U. S. Atty., Southern District of New York, for plaintiff; Alan G. Blumberg, Asst. U. S. Atty., of counsel.

Shearman & Sterling, New York City, for defendants; Paul R. Russell, New York City, of counsel.

OPINION, FINDINGS OF FACT and CONCLUSIONS OF LAW.

LEVET, District Judge.

In this action the United States of America seeks collection of corporate income taxes allegedly due from the defendant 58th Street Plaza Theatre, Inc. ("Plaza") for the period 1943 through 1949. The United States also asks judgment against Leo Brecher ("Leo"), Walter Brecher ("Walter"), Vivian Pack ("Vivian"), and Leo and Walter Brecher as Executors of the Estate of Jeannette Brecher ("Jeannette" [1] ), alleged transferees of the corporate defendant while the corporation was insolvent.

1. Jeannette died October 12, 1961.

The answer to the amended complaint consists of (1) certain denials, (2) allegations that certain tax deficiencies are barred by the statute of limitations, and (3) claims that, contingent upon a holding that individual defendants were transferees for the corporation, defendants are entitled to certain offsets and recoupments.

The action was tried to the court without a jury.

After hearing the testimony of the parties, examining the exhibits, the pleadings and the proposed findings of fact and conclusions of law submitted by counsel, this court makes the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

### PLAZA, ITS CORPORATE STRUCTURE, STOCKHOLDERS, DIRECTORS, OFFICERS AND CONTROL

1. Defendant Plaza, a domestic corporation with its principal place of business in the Borough of Manhattan, City and State of New York, was incorporated on January 13, 1930 under the laws of the State of New York with an authorized capital stock consisting of 2,000 shares without par value. (Stip., ¶3 [2]).

2. The stockholders of Plaza were Leo, his wife Jeannette, and their children, Walter and Vivian. Their stockholdings at the dates relevant to this action were:

| | Leo | Jeannette | Walter | Vivian |
|---|---|---|---|---|
| 6/21/39 to 2/28/42 | 1550 | 425 | 0 | 0 |
| 3/28/42 to 1/4/43 | 1050 | 425 | 250 | 250 |
| 1/4/43 to 10/1/53 | 1050 | 25 | 450 | 450 |

400 of 425 shares owned by Jeannette were a gift from Leo. All of the shares owned by Walter and Vivian were acquired as gifts from their parents, Leo and Jeannette. (Stip., ¶¶ 9, 16, 17, 20)

3. At all times relevant herein (i. e., from 6/21/39 to 10/5/53), the directors of Plaza were Leo, Jeannette and Frank Schiffman. (Ex. 60) Mr. Schiffman, an officer but not a stockholder of Plaza, was an associate of Leo in various other enterprises. (60–63) [3]

4. Leo was responsible for the formation of Plaza and at all times relevant herein he was Plaza's principal and controlling stockholder, officer and director. Leo was primarily responsible for operation and management of Plaza and he made all important decisions. He was fully familiar with all its affairs. (7–9)

### THE LEASE BY WALTER READE TO LEO

5. On June 21, 1939, Leo leased from Walter Reade certain premises on 58th Street near Madison Avenue, New York City, which were occupied by a motion picture theatre known as the Plaza Theatre. The lease, for a period of 20 years commencing September 1, 1939, provided for an annual rental of $30,000 per year plus 15% of annual box office receipts in excess of $225,000 plus all taxes and fire insurance premiums on the property in excess of $7,500 per year. (Ex. 3; Stip., ¶¶ 11–12)

6. Pursuant to the provisions of said Reade-Brecher lease, Leo paid Reade a security deposit of $40,000 in cash, plus an additional $10,000 by means of twenty-four promissory notes, making a total security deposit of $50,000. Such

2. The parties' stipulation is Exhibit 58.

3. Unless otherwise designated, numbers in parentheses refer to pages in the stenographer's trial minutes.

security deposit was recoverable by subsequent deductions from the rent. (Ex. 3, ¶ 13; 101)

7. During the period from September 1, 1939 to February 28, 1942, Plaza occupied and operated the theatre for Leo and paid rent to Reade, as well as those of the aforesaid notes made by Leo to Reade for security deposit which became due during said period. (Stip., ¶ 14; 11–12) Leo, as the principal officer of Plaza, personally managed the theatre operations. (15) During this period Plaza also reimbursed Leo for the $40,000 security deposit which he had given to Reade. (99, 101–102)

## ASSIGNMENT OF LEASE BY LEO TO PLAZA

8. On February 28, 1942, Leo, with the approval of Plaza's board of directors (Ex. 60; 62–64), sold the Reade-Brecher lease to Plaza for $200,000, payable $1,200 per month without interest. (Stip., ¶ 15; Ex. 4; 14) Plaza operated the theatre. As original lessee, Leo remained personally liable on the Reade-Brecher lease. (78)

9. Leo received $1,200 per month from Plaza as installment payments on the sale of the lease, and he claimed that these payments were taxable at capital gain rates. Plaza claimed the right to amortize the $200,000 cost of the leasehold over its remaining term, from February 28, 1942 to September 1, 1959, at the rate of $11,428.56 per annum. (Stip., ¶ 30)

## PLAZA SUBLEASES TO JEANNETTE

10. On December 29, 1942, Plaza subleased the theatre to Leo's wife, Jeannette, for a term of five years commencing January 1, 1943. Under the terms of the sublease, Jeannette was to pay a fixed rental of $40,000 per year, plus 15% of the amount by which the box office receipts exceeded $225,000 in each year, plus $15,000 per annum out of the profits from the operation of the theatre (if earned) and all taxes and fire insurance premiums on the property in excess of $7,500 per year. (Ex. 5; Stip., ¶ 18; 16)

11. The sublease from Plaza to Jeannette was in effect from January 1, 1943 to November 15, 1945. During that period, Jeannette paid the sublease rentals to Plaza; Plaza paid the lease rentals to Reade and paid the $1,200 monthly installment to Leo.

12. During the period January 1, 1943 to November 15, 1945, corporate earnings were taxable at war-time excess profits tax rates. (Exs. 9, 10, 11) Individual earnings were not subject to excess profits although they were subject to graduated surtaxes.

13. During the period January 1, 1943 to November 15, 1945, Leo remained personally liable on the Reade-Brecher lease. (78) He continued to manage the theatre operations as he had done from September 1, 1939 to December 31, 1942. During the above period, however, he managed as an employee of his wife, Jeannette, for which she paid him a salary of $6,000 per annum. (Stip., ¶ 21) Leo was still president of Plaza.

14. During the entire period of its existence, the Jeannette sublease served no business purpose of Plaza but was merely a family arrangement (a) to provide Jeannette with increased income; (b) to avoid the payment of high taxes by Plaza; and (c) to divert corporate assets from Plaza.

## THE SUBLEASE TO THE PARTNERSHIP

15. On November 16, 1945, the sublease to Jeannette was terminated, and the theatre was subleased to a partnership known as "58th St. Plaza Theatre Co." The new partnership was composed of Jeannette, Leo, Walter and Vivian as equal 25% partners under a written partnership agreement. (Ex. 12) The partners each contributed $6,250 (totalling $25,000), which was paid by the partnership to Plaza as a security deposit. (38–39) The partnership paid the theatre rental to Plaza and Plaza paid it to

Reade. This sublease to the partnership was in effect from November 16, 1945 through December 31, 1948, but no written assignment of the existing sublease to the partnership or written cancellation of the existing sublease or a new sublease was produced at the trial. (32–37)

16. The amount of theatre earnings received by the four stockholders during the period of the partnership, less credit for the book value as of January 1, 1949, of theatre fixtures purchased by the partnership and surrendered to Plaza on January 1, 1949, is as follows (Ex. 15):

| YEAR | JEANNETTE | LEO | WALTER | VIVIAN |
|------|-----------|-----|--------|--------|
| 1943 | 40,096.64 | — | — | — |
| 1944 | 37,372.31 | — | — | — |
| 1945 | 37,146.90 | — | — | — |
| 10/31/46 | 9,275.18 | 9,275.18 | 9,275.18 | 9,275.18 |
| 10/31/47 | 1,324.03 | 1,324.03 | 1,324.03 | 1,324.03 |
| 10/31/48 | 1,987.81 | 1,987.81 | 1,987.81 | 1,987.81 |
| 12/31/48 | 447.28 | 447.28 | 447.28 | 447.28 |
| (credit for fixture values) | (3,174.46) | (3,174.46) | (3,174.46) | (3,174.46) |
| | 124,475.69 | 9,859.84 | 9,859.84 | 9,859.84 |

17. During this partnership period, Plaza's operating profits, after rent to Reade and operating expenses, were as follows:

| YEAR | AMOUNT |
|------|--------|
| 1946 | $24,858.07 |
| 1947 | 24,523.10 |
| 1948 | 20,534.78 |
| | $69,915.95 (Ex. 14) |

18. During this partnership period, Leo remained personally liable under the Reade-Brecher lease (58) and he personally managed the theatre as an employee of the partnership. Leo's son, Walter, handled the advertising, wrote the programs, prepared displays, booked the shorts, hired and fired the help, purchased the equipment and attended to maintenance, all under Leo's direction. (211, 212) At that time, Leo also operated other theatres (45) and appears to have been largely a consultant and troubleshooter, although he said he was the "boss." (46) Neither Jeannette nor Vivian made any material contributions to the theatre's operation. (45) Walter and Leo each received salaries of $5,000 per annum and each partner received 25% of the profits. (47) At some time in 1948, Plaza returned to the partnership the $25,000 security deposit which the partnership had contributed at the commencement of the sublease. (57)

19. A fair preponderance of the credible evidence indicates that as a husband, parent, as well as the principal controlling officer, director and stockholder of Plaza, Leo made the decision to cancel the sublease to Jeannette and to effectuate the new sublease to the partnership.

20. The sublease to the partnership served no business purpose of the corporation, Plaza, and merely brought about (in a manner similar to the Jeannette sublease) a distribution of the theatre's earnings to the family members (191) and should be treated, for tax purposes, in the same way as the sublease to Jeannette as determined by the Tax Court in its 1951 decision hereinafter mentioned.

21. The sublease arrangements, described above, transferred corporate assets, namely the theatre earnings, to Jeannette and to the partnership at the later period. Plaza received no consideration whatsoever for the transfers.

The transactions were not at arms length and were approved by director and officers who were personally interested therein.

## THE PARTNERSHIP SELLS ITS RIGHTS UNDER THE SUBLEASE BACK TO PLAZA

22. The partnership continued during the years 1946, 1947 and 1948. On January 1, 1949, the partnership, controlled by Leo (41, 42, 46), sold its rights under the sublease back to Plaza for a sum of $25,000, which was to be paid by Plaza over the return of the security deposit. Of the $25,000, $15,000 was paid to the partnership ($7,500 in 1949, $6,000 in 1950 and $1,500 in 1951). (Stip., ¶ 29; 55–59) On January 1, 1949, Plaza resumed operation of the theatre under the Reade-Brecher lease; Leo and Walter still managed the theatre.

23. On and after January 1, 1943, after payment of sums to Leo, to Jeannette, to Walter, to Vivian, or to the partnership, Plaza was in no position to pay any substantial tax assessments. Plaza's current assets, consisting of cash and accounts receivable, were at all times insufficient to pay its accruing tax liabilities and interest thereon, as shown by the following schedule:

| Year Ending (December 31) | CURRENT ASSETS | ACCRUED TAX LIABILITY AND INTEREST |
|---|---|---|
| 1943 | $ 2,843.03 (Ex. 9) | $ 34,404.43 (Ex. 62) |
| 1944 | 4,100.23 (Ex. 10) | 65,939.69 (Ex. 62) |
| 1945 | 10,865.41 (Ex. 11) | 99,439.22 (Ex. 62) |
| 1946 | 41,979.71 (Ex. 23) | 114,843.22 (Ex. 62) |
| 1947 | 27,508.71 (Ex. 24) | 126,952.49 (Ex. 62) |
| 1948 | 13,701.51 (Ex. 25) | 136,085.19 (Ex. 62) |
| 1949 | 48,327.62 (Ex. 26) | 144,222.08 (Ex. 62) |
| 1950 | 54,274.83 (Ex. 27) | 151,067.66 (Ex. 62) |
| 1951 | 24,650.00 (Ex. 28) | 157,930.60 (Ex. 62) |
| 1952 | 11,128.30 (Ex. 29) | 165,583.09 (Ex. 53, p. 2) |
| 1953 (Oct. 1) | 1,752.16 ((Ex. 30) | 176,112.80 (Ex. 53, p. 2) |

24. In a statement annexed to Plaza's 1946 tax return (Ex. 23, p. 3) Leo admitted that Plaza lacked funds to pay the outstanding tax deficiencies with interest. He further admitted that he was aware of this situation at the time of the various distributions by the corporation to the individual defendants. (24, 55, 59, 60–61, 72–74)

## PAYMENTS TO TRANSFEREES

25. In spite of Plaza's financial situation, the $1,200 month installment payments to Leo were continued during the period from January 1, 1943 through October 1, 1953—at a time when Plaza was insolvent and indebted to the United States for taxes and interest due. Although in 1946, 1947, 1948 and 1949 no payments were made from Plaza to Leo on account of the $200,000 purchase price of the Reade-Brecher lease, Plaza paid $14,400 to Leo on account of this obligation in 1950. (Ex. 59) The payment of $14,400 to Leo in 1950 was made with full knowledge that Plaza was unable to pay the tax deficiency claimed by the Internal Revenue Service and with full knowledge of the decline in Plaza's business that had commenced in 1947.

## DIVIDEND PAID IN JANUARY 1949

26. In December 1948 Plaza declared a dividend of $5.00 per share to its stockholders (Leo, $5,250; Jeannette, $125; Walter, $2,250; Vivian, $2,250) which was payable in 1949. The dividend, totalling $9,875, was paid in January 1949. (Stip., ¶ 32; 54) Plaza's minute book reflects a meeting of its Board of Directors on December 24, 1948 authorizing the dividend. Leo, Jeannette and Mr. Schiffman voted unanimously to approve. (Ex. 60; 67) The dividend of $9,875 was declared, paid and accepted with full knowledge that Plaza was unable to pay the tax deficiency claimed by the Internal Revenue Service (55) and with full knowledge of the decline in its business that had commenced in 1947. (187–188)

## DIVIDEND PAID IN JANUARY 1950

27. In 1950, Plaza declared and paid a dividend of $7.50 per share to its stockholders (Leo, $7,875; Jeannette, $187.-50; Walter, $3,375; Vivian, $3,375) which totalled $14,812.50. (Stip., ¶ 32; 59–61) Though the minute book of Plaza contains no minutes of any meeting of the directors authorizing the 1950 dividend (67), Leo testified that it was declared by the Board of Directors and that he participated. (60) The 1950 dividend of $14,812.50 was declared, paid and accepted with full knowledge that Plaza was unable to pay the tax deficiency claimed by the Internal Revenue Service (60–61), and with full knowledge of the decline in its business that had commenced in 1947.

## THE TAX COURT DECISION

28. Tax deficiencies for 1942 and 1943 were asserted by the Internal Revenue Service and were protested by Plaza, Leo and Jeannette. The dispute ultimately went to the Tax Court. During the pendency of this proceeding, the subsequent years, 1944–1949, were held in abeyance. (Exs. 31–34) On February 27, 1951, the Tax Court rendered its decision, 58th Street Plaza Theatre, Inc., 16 T.C. 469, in which it held:

(a) That Leo was entitled to report the $1,200 monthly payments received from Plaza in 1942 and 1943 as capital gains;

(b) That Plaza was entitled to amortize the $200,000 cost of the leasehold over its remaining life and to deduct amortization charges of $9,523.80 for 1942 and $11,428.56 for 1943; and

(c) That the Internal Revenue Service properly determined that Jeannette's 1943 net profits from her operation of the theatre under the sublease were taxable, first, as income of Plaza, and, second, as a dividend from Plaza to Jeannette, since the sublease " * * * served no business purpose of Plaza but was a family arrangement to give Jeannette increased income at the expense of Plaza and without payment of taxes thereon by Plaza." (16 T.C. at 473) The court recognized that the sublease was intended to result in a large reduction in the excess profit taxes of the corporation (16 T.C. at 476) and, thus the court held that $40,096.60 was profit to Plaza and a dividend to Jeannette.

29. On March 18, 1952, the Tax Court decision was affirmed by the United States Court of Appeals for the Second Circuit. 58th Street Plaza Theatre Inc. v. C.I.R., 195 F.2d 724 (2nd Cir. 1952). On October 13, 1952, the United States Supreme Court denied certiorari (344 U.S. 820, 73 S.Ct. 17, 97 L.Ed. 638).

## TAX ASSESSMENTS BY I.R.S. AGAINST PLAZA

30. Following the Tax Court decision, the Internal Revenue Service completed its pending audits of Plaza for the years 1944 through 1949. It applied the Tax Court ruling on the effect of the sublease to the years 1944 through 1948, as well as 1943. (Exs. 31–34) It made small adjustments for 1949. (Ex. 31,

p. 12) Taxes were assessed against Plaza and notice and demand for payment thereof was made, as follows (Stip., ¶ 4):

| Year | Tax | Principal | Interest [4] | Date of Assessment | Notice and Demand |
|------|-----|-----------|--------------|--------------------|-------------------|
| 1943 | Income | $ 1,674.88 | $ 745.87 | 8/17/51 | 8/28/51 |
| | Excess profits | 28,142.62 | 12,869.27 | 8/17/51 | 8/28/51 |
| | Declared value excess profits | 4,586.93 | 2,042.49 | 8/17/51 | 8/28/51 |
| 1944 | Income | 3,210.16 | 1,656.40 | 10/21/53 | 10/28/53 |
| | Excess profits | 23,429.45 | 12,089.28 | 10/21/53 | 10/28/53 |
| | Declared value excess profits | 3,261.46 | 1,682.87 | 10/21/53 | 10/28/53 |
| 1945 | Income | 2,829.89 | 1,290.39 | 10/21/53 | 10/28/53 |
| | Excess profits | 25,866.37 | 11,794.71 | 10/21/53 | 10/28/53 |
| | Declared value excess profits | 1,318.75 | 601.35 | 10/21/53 | 10/28/53 |
| 1946 | Income | 10,120.00 | 3,929.47 | 9/ 4/53 | 9/14/53 |
| 1947 | Income | 5,969.34 | 1,959.66 | 9/ 4/53 | 9/14/53 |
| 1948 | Income | 2,582.78 | 692.93 | 9/ 4/53 | 9/14/53 |
| 1949 | Income | 1,389.65 | 293.84 | 9/ 4/53 | 9/14/53 |
| | Totals | $114,382.28 | $51,648.53 | | |

31. None of the foregoing assessments has been paid, with the exception of the sum of $1,644.51. (Stip., ¶ 42) Plaza did not protest any of the assessments or seek to litigate the years 1944–1949 in the Tax Court. Plaza conducted no operations after October 1, 1953 and has no funds whatsoever to pay the outstanding tax assessments.

32. In 1951, following the Tax Court decision, Plaza paid Leo $57,600 on account of the $200,000 purchase price of the Reade-Brecher lease. (Ex. 59) Leo, as principal officer, director and stockholder, was principally responsible for authorizing this payment. It was made with full knowledge that Plaza was unable to pay the tax claims of the Internal Revenue Service, that its business was still declining, and that the Tax Court had upheld the Internal Revenue Service's position. (72–74)

## PLAZA REASSIGNS THE LEASE TO LEO

33. On November 5, 1952, less than one month after the Supreme Court's denial of certiorari, Plaza reassigned the Reade-Brecher lease to Leo. Simultaneously, Leo entered into an agreement with Plaza providing that Plaza could operate the theatre as his licensee and could retain the net income therefrom so long as Plaza paid the rent to Reade and $1,200 per month to Leo on account of assignment of the Reade-Brecher lease to Plaza on February 28, 1942. (Stip., ¶ 36; Ex. 22; 76–79)

34. The effect of the November 5, 1952 transaction was to put Plaza's principal asset, the Reade-Brecher lease, out of the direct reach of Plaza's principal creditor, the United States, and into the possession or control of Leo, who was personally liable on the lease but was at

4. Assessed interest represents interest accrued on respective deficiencies to date of assessments.

most a general unsecured creditor of Plaza with respect to the balance due him from Plaza on account of the assignment of the lease. Although Leo testified that his purpose was to insure that the landlord Reade could not exercise his right to cancel the lease by reason of the insolvency of the "legal owner and holder" of the lease (Ex. 3, ¶ 24; 76–77), there was no evidence that Reade was likely to cancel. In fact, Reade had never been notified of the assignment to Plaza (167) and Leo remained personally liable to Reade as original lessee. (78, 166)

35. The November 5, 1952 agreement referred to in Finding 33 was signed by Leo individually and, on behalf of Plaza, by Leo as president. The minute book of Plaza contains no minutes of any meeting of the directors approving the transaction. (79)

## LEO LICENSES THE THEATRE TO PLAZA

36. From November 5, 1952 to October 1, 1953, Plaza operated the theatre as Leo's licensee. Leo and Walter managed the theatre. (79–80) During the period November 5, 1952 to October 1, 1953, Plaza fully complied with the license agreement. (Ex. 22) It paid Leo $14,400 in 1952 and $10,800 in 1953 on account of the leasehold assignment. It paid the rent to Reade. (Ex. 59; 81)

## PLAZA SURRENDERS LEASEHOLD RIGHTS TO LEO

37. On October 1, 1953, though Plaza had complied with the license agreement, Plaza surrendered to Leo all its rights in the Reade-Brecher lease. (Ex. 36; 102–105) On that date, Plaza discontinued all operation of the theatre. Leo took over the Reade-Brecher lease and thereafter operated the theatre for his own account. (88) The surrender to Leo of the Reade-Brecher lease and cancellation of the license agreement transferred Plaza's principal assets to its controlling officer, director and stockholder at a time when Plaza was heavily indebted to the United States for taxes. This transfer was made with full knowledge

of Plaza's inability to pay its taxes and left it with virtually no assets. (82–83)

## AT ALL TIMES FROM JANUARY 1, 1943 THROUGH DECEMBER 31, 1948, PLAZA WAS INSOLVENT IN THE "BANKRUPTCY" SENSE —THAT IS, ITS LIABILITIES, INCLUDING ACCRUED TAXES AND INTEREST, EXCEEDED ITS ASSETS

38. (a) On the basis of Plaza's balance sheet book value (see tax returns, Exs. 9, 10, 11, 23, 24) and the accrual of the taxes ultimately assessed, plus interest, Plaza's liabilities exceeded its assets as follows:

| Date | Surplus (Deficit) |
| --- | --- |
| December 31, 1943 | $ 3,838.02 |
| December 31, 1944 | (22,324.67) |
| December 31, 1945 | (48,925.07) |
| December 31, 1946 | (55,059.44) |
| December 31, 1947 | (58,149.38) |
| December 31, 1948 | (70,766.97) |

(See also Ex. 62; 114, 115)

(b) In addition to other assets shown on the balance sheet of Plaza, the Reade-Brecher lease was carried at its $400,000 cost less amortization, and the fixtures installed in the theatre by Plaza were carried at cost less depreciation. (Exs. 9, 10, 11, 23, 24, 25)

(c) The fair market value of Plaza's interests retained in the Reade-Brecher lease during the above period, January 1, 1943 through December 31, 1948, was not equal to its book value since the fair market value is properly measured by the capitalized value of the yearly net income Plaza received from the lease itself. In effect, this was the excess of rental income from the two sub-leases over the rental payments on the Reade-Brecher lease. Thus, the maximum income that Plaza could derive from the theatre pursuant to the sublease was $25,000 per annum, which was composed of $10,000 based on the receipt of $40,000 annually, less the $30,000 payable as rental to Reade, plus $15,000 out of the profits from the operation of the theatre. (16, 17) I find that the fair market value of

Plaza's interest in the said lease, capitalized at the rate of 15% (121), was as follows:

| | |
|---|---:|
| December 31, 1943 | $148,850 |
| December 31, 1944 | 146,175 |
| December 31, 1945 | 143,100 |
| December 31, 1946 | 139,575 |
| December 31, 1947 | 135,500 |
| December 31, 1948 | 104,660 |

(d) After adjustment of the balance sheets of Plaza to reflect the fair market value of Plaza's retained interest in the Reade-Brecher lease and substitution of the same in place of the book values of the theatre and theatre fixtures, I find that the liabilities of Plaza, including accrued taxes and interest, exceeded its assets as follows:

| | Deficit |
|---|---:|
| December 31, 1943 | ($38,053.97) |
| December 31, 1944 | ( 52,244.18) |
| December 31, 1945 | ( 63,889.83) |
| December 31, 1946 | ( 61,648.90) |
| December 31, 1947 | ( 57,130.28) |
| December 31, 1948 | ( 88,904.31) |

(Exs. 63, 64; 125–129)

39. The proof offered by defendants to demonstrate that Plaza was solvent during the above period (see Ex. B; 196–208, 220–224) is deficient since it was predicated upon the assumption that the fair market value of the Reade-Brecher lease was measured by capitalizing the total theatre earnings, including the earnings received and retained by the sub-lessees. (Stip., ¶¶ 51, 60, 61; 164) During this period, however, Plaza had transferred the right to such theatre earnings to the sublessees and did not regain it until the cancellation of the second sublease on January 1, 1949.

## AT ALL TIMES DURING THE PERIOD FROM JANUARY 1, 1949 THROUGH OCTOBER 1, 1953, PLAZA WAS INSOLVENT IN THE "BANKRUPTCY" SENSE

40. (a) Based upon Plaza's balance sheet book values (see Exs. 26, 27, 28, 29, 30) and upon the totals of the accrued taxes plus interest assessed, Plaza's liabilities exceeded its assets during this period as follows:

| Year | Deficit | |
|---|---:|---|
| December 31, 1949 | ($ 74,175.62) | (Ex. 62) |
| December 31, 1950 | ( 100,165.14) | (Ex. 62) |
| December 31, 1951 | ( 108,668.63) | (Ex. 62) |
| December 31, 1952 | ( 128,570.93) | (Ex. 29) |
| October 1, 1953 | ( 219,833.31) | (Ex. 30) |

The deficits of December 31, 1952 and October 1, 1953, as set forth above, were admitted on Plaza's federal income tax returns. (Exs. 29, 30)

(b) Defendants' proof offered to demonstrate that Plaza was solvent during 1949 and 1950 is inadequate. (See Ex. B; 196–208, 220–224)

41. AT ALL TIMES FROM JANUARY 1, 1943 THROUGH OCTOBER 1, 1953, PLAZA WAS INSOLVENT IN THE "EQUITY" SENSE —THAT IS, PLAZA WAS UNABLE TO PAY ITS DEBTS, INCLUDING ACCRUED TAXES AND INTEREST, AS SUCH DEBTS MATURED IN THE ORDINARY COURSE OF BUSINESS.

Plaza's current assets, consisting of cash and accounts receivable, at all times were insufficient to pay its accruing tax liabilities and interest thereon, as follows:

| Year Ending | Current Assets | Accrued Tax Liability & Interest |
|---|---|---|
| (December 31) | | |
| 1943 | $ 2,843.03 (Ex. 9) | $ 34,404.43 (Ex. 62) |
| 1944 | 4,100.23 (Ex. 10) | 65,939.69 (Ex. 62) |
| 1945 | 10,865.41 (Ex. 11) | 99,439.22 (Ex. 62) |
| 1946 | 41,979.71 (Ex. 23) | 114,843.22 (Ex. 62) |
| 1947 | 27,508.71 (Ex. 24) | 126,952.49 (Ex. 62) |
| 1948 | 13,701.51 (Ex. 25) | 136,085.19 (Ex. 62) |
| 1949 | 48,327.62 (Ex. 26) | 144,222.08 (Ex. 62) |
| 1950 | 54,274.83 (Ex. 27) | 151,067.66 (Ex. 62) |
| 1951 | 24,650.00 (Ex. 28) | 157,930.60 (Ex. 62) |
| 1952 | 11,128.30 (Ex. 29) | 165,583.09 (Ex. 53, p. 2) |
| 1953 | 1,752.16 (Ex. 30) | 176,112.80 (Ex. 53, p. 2) |
| (Oct. 1) | | |

In a statement annexed to its 1946 tax return (Ex. 23, p. 3), Plaza admitted that it lacked sufficient funds to pay the outstanding tax deficiencies plus interest. Leo also admitted at trial that Plaza lacked funds to pay the tax deficiencies and interest. (24, 55, 59–61, 72–74)

CORPORATE FUNDS AND ASSETS WHICH COULD HAVE BEEN USED TO PAY TAXES WERE TRANSFERRED FROM PLAZA TO ONE OR MORE OF ITS STOCKHOLDERS DURING THE YEARS 1943 THROUGH 1953.

42. (a) The theatre earnings received by Jeannette during the period of her sublease (January 1, 1943 through November 15, 1945) were as follows:

| 1943 | $ 40,096.64 |
|---|---|
| 1944 | 37,372.31 |
| 1945 | 37,146.90 |
| | $114,615.85 |

(See Ex. 15, which was prepared by defendants; Stip., ¶ 22)

(b) The total profits of the members of the partnership (excluding salaries) during the period when the partnership held the sublease (November 16, 1945 to December 31, 1948) were as follows:

| Year Ending | Amount |
|---|---|
| October 31, 1946 | $37,100.70 |
| October 31, 1947 | 5,296.14 |
| October 31, 1948 | 7,951.24 |
| October 31, 1949 | 1,789.13 [5] |
| | $ 52,137.21 (See Ex. 15) |

5. Footnote (a) to Exhibit 15 states that the sum of $9,289.13 "includes $7,500 Installment Profit—Sale of Leasehold for $25,000—Initial Payment," and, consequently, it is proper to reduce the earnings under the period in 1949 to October 31 to $1,789.13 to reflect new sum.

(c) The amount of the theatre earnings received by the four stockholders individually during the period of the partnership, less credit for the book value as of January 1, 1949, of the theatre fixtures purchased by the partnership during its operation and surrendered to Plaza on January 1, 1949, is as follows (Ex. 15):

| Year | Jeannette | Leo | Walter | Vivian |
|---|---|---|---|---|
| 10/31/46 | $ 9,275.18 | $ 9,275.18 | $ 9,275.18 | $ 9,275.18 |
| 10/31/47 | 1,324.03 | 1,324.03 | 1,324.03 | 1,324.03 |
| 10/31/48 | 1,987.81 | 1,987.81 | 1,987.81 | 1,987.81 |
| 12/31/48 | 447.28 | 447.28 | 447.28 | 447.28 |
| TOTAL | $13,034.30 | $13,034.30 | $13,034.30 | $13,034.30 |
| (credit for fixtures values) | (3,174.46) | (3,174.46) | (3,174.46) | (3,174.46)[6] |
| NET | $ 9,859.84 | $ 9,859.84 | $ 9,859.84 | $ 9,859.84 |

(d) The following payments, totalling $15,000, were made by Plaza to the partnership on account of the $25,000 "sale" price paid for cancellation of the sublease on January 1, 1949 (Stip., ¶ 29):

| 1949 | $7,500 |
|---|---|
| 1950 | 6,000 |
| 1951 | 1,500 |

Each of the four partners received 25% of these payments, or $3,750. (110) The balance of $10,000 was never paid.

(e) Dividends were declared and paid by Plaza in 1948 and 1950 as follows (Stip., ¶ 32):

| Year | Jeannette | Leo | Walter | Vivian |
|---|---|---|---|---|
| 1948 [7] | $125.00 | $ 5,250.00 | $2,250.00 | $2,250.00 |
| 1950 | 187.50 | 7,875.00 | 3,375.00 | 3,375.00 |
| | $312.50 | $13,125.00 | $5,625.00 | $5,625.00 |

6. The amount of the above-mentioned credit for fixture values is derived from the book value of the theatre fixtures as set forth in Plaintiff's Ex. 20, p. 3. There the fixtures of $13,341.26, under the heading "Remaining Costs" was the book value of the fixtures as of the beginning of the taxable year, October 31, 1948. The annual allowable depreciation for the taxable year ending October 31, 1949 (see column headed "Depreciation") was $643.41, which represents the depreciation for the period November 1, 1948 through December 31, 1948 only. Hence, book value as of January 1, 1949 was $13,341.26 less $643.41, or $12,697.85, which plaintiff concedes is a credit to defendants.

7. Declared December 24, 1948 and paid January 2, 1949.

(f) The $1,200 monthly payments made from January 1, 1943 to October 1, 1953 by Plaza to Leo, its president, director and principal and controlling stockholder, on account of the sale of the leasehold for $200,000, were as follows (Ex. 59):

| 1943 | $ 14,400 |
| 1944 | 14,400 |
| 1945 | 10,700 |
| 1946 | –0– |
| 1947 | –0– |
| 1948 | –0– |
| 1949 | –0– |
| 1950 | 14,400 |
| 1951 | 57,600 |
| 1952 | 14,400 |
| 1953 | 10,800 |
| TOTAL | $136,700 |

Leo caused the foregoing payments to be made to himself knowing that Plaza was unable to pay the pending tax claims. The 1951, 1952 and 1953 payments, totalling $82,800, were made after the Tax Court had upheld the Internal Revenue Service.

(g) The Reade-Brecher lease was assigned to Leo on November 5, 1952, and the surrender of all of Plaza's rights therein on October 1, 1953 deprived Plaza and its creditor, the United States, of the corporation's sole income-producing asset. Leo, its principal and controlling stockholder, officer and director, appropriated this asset for his own benefit. The Board of Directors did not meet to approve this transaction. The value of the assets received by Leo on October 1, 1953 were as follows:

| Reade-Brecher lease | $55,000 | (Stip., ¶¶ 51, 59) |
| Security Deposit | 28,000 | (Stip., ¶ 54) |

———◆———

Leo received the profits from the theatre (88–94) and the benefit of the security deposit (195) on and after October 1, 1953. He also agreed to reimburse Plaza for the security deposits less debts he paid. (103)

The surrender to Leo of the Reade-Brecher lease and security deposit on October 1, 1953 were payments of a debt of Plaza at a time when Plaza was insolvent in the "bankruptcy" sense and indebted to the United States. The debts due the United States were not satisfied and paid.

43. The above diversions or transfers of funds, dividends and assets of Plaza to the stockholders were conveyances of Plaza's property without fair consideration at a time when Plaza was insolvent in the "bankruptcy" sense within the meaning of Section 273 of the New York Debtor and Creditor Law, McKinney's Consol.Laws, c. 12, and at a time when Plaza intended or believed it would incur debts beyond its ability to pay as they matured within the meaning of Section 275 of the New York Debtor and Creditor Law.

44. All of the transfers set forth in Finding 42 were made when Plaza was insolvent in the "equity" sense, and they were made with intent to give a preference within the meaning of Section 15 of the New York Stock Corporation Law, McKinney's Consol.Laws, c. 59.

45. All of the transfers set forth in Finding 42 were made with actual intent to hinder, delay or defraud Plaza's principal creditor, the United States of America, within the meaning of Section 276 of the New York Debtor and Creditor Law.

46 The respective transfers made to the individual stockholders, as aforesaid, are summarized as follows:

| | LEO | JEANNETTE | WALTER | VIVIAN |
|---|---|---|---|---|
| Earnings received by Jeannette during her sublease (1/1/43 through 11/15/45) (Finding 42(a)) | | $114,615.85 | | |
| Share of earnings of partnership (11/16/45 through 12/31/48), less credit (Finding 42(c)) | $9,859.84 | 9,859.84 | $9,859.84 | $9,859.84 |
| Share of partnership payments of $15,000 paid by Plaza for cancellation of sublease (Finding 42(d)) | 3,750.00 | 3,750.00 | 3,750.00 | 3,750.00 |
| Dividends (Finding 42(e)) | 13,125.00 | 312.50 | 5,625.00 | 5,625.00 |
| Received by Leo 1/1/43 to 10/1/53 on account of purchase of Reade-Brecher lease (Finding 42(f)) | 136,700.00 | | | |
| Received by Leo on assignment of Reade-Brecher lease on 11/5/52 and the surrender of Plaza's rights therein on 11/1/53 lease and the security deposit (Finding 42(g)) | 55,000.00 | | | |
| | 28,000.00 | | | |
| | $246,434.84 | $128,538.19 | $19,234.84 | $19,234.84 |

---

## DISCUSSION

### I.

### BACKGROUND

At the outset it is helpful to review and summarize all the transactions of the corporate defendant, Plaza, and the individual defendants, Leo, Walter, Jeannette and Vivian.

On June 21, 1939, Walter Reade leased the land and theatre thereon to Leo for a period of twenty years, commencing September 1, 1939. (Finding 5) Leo continued as lessee in occupancy until February 28, 1942. On February 28, 1942, Leo sold the lease to Plaza by assignment. (Finding 8)

On December 29, 1942, Plaza subleased the premises to Jeannette for a term of five years, commencing January 1, 1943, with a provision for renewals.

(Ex. 5) Jeannette held the lease until November 16, 1945. The tax impact for the period of 1943 was determined by the Tax Court in 58th Street Plaza Theatre, Inc. v. C.I.R., 16 T.C. 469 (1951), aff'd, 195 F.2d 724 (2nd Cir.), cert. denied, 344 U.S. 820, 73 S.Ct. 17 (1952). In this decision the Tax Court held that the Commissioner was justified in refusing to recognize sublease to Jeannette for income tax purposes and in taxing all of the operation for the period for 1943 to Plaza. Thus, the court held that $40,096.64 was a profit of Plaza and, in turn, it was a dividend to Jeannette. The corporation was to pay the tax on the profit and Jeannette was to pay the tax on the amount as a dividend.

On November 16, 1945, Jeannette assigned her sublease to a partnership composed of Leo, Jeannette, Walter and Vivian, doing business under the name of "58th St. Plaza Theatre." (Ex. 12) This arrangement continued to December 31, 1948.

As of January 1, 1949, the partnership sold its rights under the sublease back to Plaza. (Finding 22) This ownership of the lease continued to November 5, 1952, when Plaza reassigned the lease to Leo and Leo licensed Plaza to operate the theatre. (Finding 33) This arrangement continued to October 1, 1953. (Finding 37) At that time Plaza, in effect, gave up its license, and Leo took over and thereafter operated the theatre for his own account.

On January 31, 1956, Reade sold the fee ownership of the premises to Daljen Corporation, of which Leo was the principal stockholder, and Leo became a tenant of Daljen. (Stip. 40; 89–94) On December 31, 1957, Leo surrendered the Reade-Brecher lease to Daljen Corporation and operated the theatre as an officer and employee of Daljen. (Stip. 40; 89–94)

Leo controlled and directed all operations of the various companies during the time when all of these transactions took place.

## II.

**PLAINTIFF IS ENTITLED TO JUDGMENT AGAINST THE CORPORATE DEFENDANT, PLAZA, FOR THE SUM OF $114,382.28, THE TAXES ASSESSED FOR THE YEARS 1943–1949, TOGETHER WITH INTEREST THEREON.[8]**

Taxes for 1943, during the Jeannette sublease, were conclusively determined by the courts. 58th St. Plaza Theatre, Inc. v. C.I.R., 16 T.C. 469 (1951), aff'd, 195 F.2d 724 (2nd Cir.) cert. denied, 344 U.S. 820, 73 S.Ct. 17 (1952). Subsequent to the court decisions, the Internal Revenue Service made assessments against Plaza as set forth above. (Finding 30) Such assessments are prima facie correct and defendants have the burden of proving that they are erroneous. United States v. Lease, 346 F.2d 696 (2nd Cir. 1965).

The proof demonstrates that the material facts in 1944 and 1945 were identical to 1943, since the aforesaid arrangement with Jeannette continued unchanged. Hence, the rule of the above tax decision of 1943 unquestionably applies to 1944 and 1945. (Finding 15)

For the period between November 15, 1945 and December 31, 1948, while the family partnership held the theatre sublease, the determination of the courts relating to the 1943 tax allocation also controls. The partnership arrangement also served no business purpose but was merely a family plan to give the stockholders increased income at Plaza's expense and without the payment of taxes thereon by Plaza. Defendants' contention that the partnership sublease fulfilled a legitimate business purpose in that it brought Leo's son Walter into the business (43, 154–155) is without merit, and such contention is insufficient to rebut the determination of the Internal Revenue Service. In fact, there were no material differences of any kind between the Jeannette and the partnership situations,

8. Less the sum of $1,644.51 paid on account thereof.

494

and in neither instance was the arrangement real, honest and bona fide.

■ The main thrust of defendants' argument to rebut the Internal Revenue Service assessments, particularly for the years 1944 to 1949, when the family partnership held the sublease, is a legal one. In essence, defendants maintain that changes in legislation and case law, which occurred after the 1951 58th St. Plaza Theatre, Inc. Tax Court decision, should be applied retroactively to the tax years at issue here in order to preclude any collateral estoppel effects of said decision upon the issues of tax liability for the later years. I do not agree with defendants' hypothesis that legal developments since the Tax Court decision represent a change in the "legal atmosphere," such that the controversy decided in 1951 would be decided differently today, and I have seen nothing in the cases or statutes supplied by defendants which would indicate that the reasoning and conclusions of the Tax Court should not be controlling upon the questions of tax liability for the years subsequent to those ruled upon at that time.

■ Defendants rely, in part, upon Section 340 of the Revenue Act of 1951, 65 Stat. 511 (Section 704(e) of the 1954 Int.Rev.Code), which changes certain aspects of the tax law relating to family partnerships. Whatever new developments are embodied in this statute, however, are expressly inapplicable to any taxable years beginning before January 1, 1951. This statute provides:

"(c) *Effective Date.*—The amendments made by this section shall be applicable with respect to taxable years beginning after December 31, 1950. The determination as to whether a person shall be recognized as a partner for tax purposes for any taxable year beginning before January 1, 1951, shall be made as if this section had not been enacted and without inferences drawn from the fact that this section is not expressly made applicable to taxable years beginning before January 1, 1951 * * *."

Moreover, the last paragraph of the House Committee Report (annexed to defendants' Supplemental Memorandum) states:

"Section 313 applies to taxable years beginning after December 31, 1950. No inferences are to be drawn from its enactment with respect to taxable years beginning prior to January 1, 1951."

In no way is this legislation relevant to determination of tax liability for the years herein at issue.

In addition to the statute, defendants submit that new case law requires this court to disregard the import of the 1951 Tax Court decision. At the outset, defendants rely upon C.I.R. v. Sunnen, 333 U.S. 591, 68 S.Ct. 715, 92 L.Ed. 898 (1948), for the proposition that they are entitled to the benefit of any case law developments whatever which may have taken place since 1951. After careful consideration, however, I have concluded that the rule of the Sunnen case must be read more narrowly. Only those changes in case law which demonstrate a difference between the principles to be applied for the years 1944 through 1949, compared with those which were applied in 1943, would, in this case, fall within the Sunnen rule that bars the application of collateral estoppel doctrine. (Since the Plaza decision has never been reversed, even under defendants' reading of Sunnen, the conclusions therein would still be pertinent to this dispute as a matter of stare decisis.) In any event, defendants have not demonstrated that recent case law developments indicate in any way that the legal standards to be applied to issues relating to the years 1944 to 1949 differ from those applied by the Tax Court for the period of 1943.

Cases dealing with family partnerships established after 1950 are not pertinent to the present controversy since they were decided under the new law noted above, and the remainder of defendants' cases, though decided in favor of taxpayers, appear to stand for no more than the proposition that cases concerning the validity of transfers between related

taxpayers present primarily factual issues for determination. For example, in Hoffman v. Commissioner, 26 T.C.M. 737 (1967), the court ruled that:

"* * * The issue is purely factual and its determination is dependent upon all the circumstances and facts existing at the time of the withdrawals * * *. The goal of the factual inquiry is the ascertainment of the subjective intent of the shareholder as to whether bona fide loans occurred at the time of the withdrawals based upon an analysis of certain objective factors * * *."

* * *

"* * * a controlling shareholder has the ability to manipulate the affairs of his corporation so as to obtain the permanent use of corporate funds without the declaration of a taxable dividend by using the guise of loans from the corporation. The possible presence of a tax evasion motive in such a case invites our careful scrutiny of all factors and details as well as the overall situation * * *." (26 T.C.M. at 740)

Careful scrutiny was given to the Plaza arrangements in 1951 by the Tax Court, and its determinations that the Jeannette sublease served no business purpose of Plaza was affirmed by the Court of Appeals for the Second Circuit in 1952. Furthermore, these decisions were reached absent the knowledge that (a) the sublease to Jeannette was cancelled in 1945 and replaced by the partnership sublease, and (b) the second sublease was cancelled in 1949 and "sold" back to the corporation for $25,000. Such additional factors could only reinforce the validity of the 1951 determination, and they add weight to plaintiff's present claims.

■ Finally, relying upon Section 45 of the 1939 Internal Revenue Code, defendants urge that even if an unfair diversion of profits resulted from the Plaza arrangements, nevertheless, the Commissioner should still have allocated less than all of the profits to Plaza.

Section 45 (Section 482 of the 1954 Code) states:

"In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Commissioner is authorized to distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses."

Defendants, however, have not presented proof to substantiate their claim under this section, and under similar circumstances the allocation of 100% of the income of several related taxpayers to a single taxpayer has been found to be proper under Section 45. See Advance Machinery Exchange, Inc. v. C.I.R., 196 F.2d 1006 (2nd Cir.), cert. denied, 344 U.S. 835, 73 S.Ct. 45, 97 L.Ed. 650 (1952).

■ No authorities relied upon by defendants stand for the rule that the Internal Revenue Service is compelled to accept at face value the legal form of transactions selected by a taxpayer. Certainly, at this time it is clear that, for tax purposes, substance, not form, must prevail. See e. g., Griffin & Company, Inc. v. United States, 389 F.2d 802 (Ct.Cl. 1968); Northern Trust Co. v. United States, 389 F.2d 731 (7th Cir. 1968).

■ The defendants have failed to produce a fair preponderance of credible evidence to show the assessments for 1943 through 1949 to be erroneous and, thus, the assessments must be upheld. United States v. Lease, supra. Therefore, plaintiff is entitled to judgment against defendant Plaza in the sum of $114,382.28 plus interest less the sum of $1,644.51 tendered on account thereof.

## III.
### TRANSFEREE LIABILITY

Since the Reade-Brecher lease was caused to be assigned to Leo on November 5, 1952, thereby depriving defendant Plaza of its sole income-producing asset (Findings 42(g), 46), plaintiff seeks judgment against the individual defendants as transferees inasmuch as it it would be "bootless for the Commissioner to proceed against the transferor." Kreps v. C.I.R., 351 F.2d 1, 9 (2nd Cir. 1965).

■ The Internal Revenue Code, Section 6901, contains an operational procedure available to the United States for assessing transferee liability and enforcing collection thereafter. As stated in Mertens, Federal Income Taxation, § 53.05:

"The transferee provisions do not impose any new obligations upon the transferee of property of a taxpayer; they merely permit collection from him by a summary procedure of his existing liability in law or equity. In other words, it is the liability of the taxpayer-transferor that could have been enforced by appropriate remedy in the Federal courts which is enforced under the transferee provision. Thus, the nature and extent of a transferee's liability must be determined by the settled principles of the common-law and Federal and local statutes."

Assessments were made against Plaza, the taxpayer, and, thus, though no assessments were then made against the transferee-stockholders, the government may, nevertheless, proceed judicially against Plaza's transferees without first assessing transferee liability. Leighton v. United States, 289 U.S. 506, 53 S.Ct. 719, 77 L.Ed. 1350 (1933); Payne v. United States, 247 F.2d 481 (8th Cir. 1957), cert. denied, 355 U.S. 923, 78 S.Ct. 367, 2 L.Ed.2d 354 (1958).

The federal priority statutes are 31 U.S.C. §§ 191 and 192. Section 191 in relevant part is as follows:

"Whenever any person indebted to the United States is insolvent, or whenever the estate of any deceased debtor, in the hands of the executors or administrators, is insufficient to pay all the debts due from the deceased, the debts due to the United States shall be first satisfied; * * *."

Section 192 is as follows:

"Every executor, administrator, or assignee, or other person, who pays, in whole or in part, any debt due by the person or estate for whom or for which he acts before he satisfies and pays the debts due to the United States from such person or estate, shall become answerable in his own person and estate to the extent of such payments for the debts so due to the United States, or for so much thereof as may remain due and unpaid."

■ Priority under Sections 191 and 192 is established when tax indebtedness first accrues, even though the indebtedness is protested and formal assessment does not occur until years later. Viles v. C.I.R., 233 F.2d 376 (6th Cir. 1956). Furthermore, any preferential payment will violate the statute, and the four-month period prescribed by the Bankruptcy Act is inapplicable. Lakeshore Apts., Inc. v. United States, 351 F.2d 349 (9th Cir. 1965). Under Sections 191 and 192, the test is insolvency in the "bankruptcy" sense. Kreps v. C.I.R., supra; United States v. Gotwals, 156 F.2d 692, 169 A.L.R. 619 (10th Cir.), cert. denied 329 U.S. 781, 67 S.Ct. 204, 91 L.Ed. 670 (1946).

■ The fact that a corporate officer paid corporate debts owed to himself is not a defense to the government's claims of priority. Mertens, supra, § 53.36, notes that:

"The mere fact that the transferee uses assets which he receives to pay debts of the transferor will not relieve him of liability. He must also show that the debts paid had priority over the tax liability."

See also United States v. Sullivan, 214 F.Supp. 701 (W.D.Pa.1963); United

States v. Spitzer, 261 F.Supp. 754 (S.D. N.Y.1966); Fada Gobins, 18 T.C. 1159 (1952), aff'd per curiam, Gobins v. C.I.R., 217 F.2d 952 (9th Cir. 1954).

In addition to the fact that Plaza's obligations paid to Leo for sale of the theatre lease are not excluded from the coverage of Sections 191 and 192, Plaza's debts paid to trade creditors after Plaza's surrender of the lease and security deposit to Leo, which totalled $17,129.51, are also not excluded from coverage. Defendants cannot offset such payments against the government's claim. Finally, it is certain that the statute was not intended to permit gratuitous distributions to Plaza's shareholders.

In conjunction with the federal priority statutes, transferee liability is also a question of local law. United States v. Truax, 223 F.2d 229 (5th Cir. 1955). In New York, the basis for such liability is found in the New York Debtor and Creditor Law, §§ 270–278, and the New York Stock Corporation Law, § 15.

The definitions set forth in the New York Debtor and Creditor Law, § 270, are as follows:

"In this article 'assets' of a debtor means property not exempt from liability for his debts. To the extent that any property is liable for any debts of the debtor, such property shall be included in his assets.

" 'Conveyance' includes every payment of money, assignment, release, transfer, lease, mortgage or pledge of tangible or intangible property, and also the creation of any lien or incumbrance.

" 'Creditor' is a person having any claim, whether matured or unmatured, liquidated or unliquidated, absolute, fixed or contingent.

" 'Debt' includes any legal liability, whether matured or unmatured, liquidated or unliquidated, absolute, fixed or contingent."

Section 271 provides:

"1. A person is insolvent when the present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured.

"2. In determining whether a partnership is insolvent there shall be added to the partnership property the present fair salable value of the separate assets of each general partner in excess of the amount probably sufficient to meet the claims of his separate creditors, and also the amount of any unpaid subscription to the partnership of each limited partner, provided the present fair salable value of the assets of such limited partner is probably sufficient to pay his debts, including such unpaid subscription."

The standard to be applied under this statute is insolvency in the "bankruptcy" sense.

"Fair consideration" is defined in Section 272 as follows:

"Fair consideration is given for property, or obligation,

"a. When in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or

"b. When such property, or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property, or obligation obtained."

Though defendants have contended that there were no "transfers" by Plaza to the individual defendants, it cannot be seriously disputed that the diversion of theatre earnings, the payments on cancellation of the sublease, dividends, the $1,200 payments to Leo, and the surrender of the sublease to Leo were "conveyances" within the meaning of Section 270. With the exception of the $1,200 payments to Leo, which were in payment of an antecedent debt (and which fall within the provisions of 31 U.S.C. §§ 191,

192, supra), none of these conveyances was for fair consideration.

Section 273 provides that:

"Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration."

The diversion of theatre earnings, payments on cancellation of the sublease and dividends paid by Plaza are unquestionably fraudulent conveyances within the meaning of Section 273.

Furthermore, Sections 274 and 275 state:

"Every conveyance made without fair consideration when the person making it is engaged or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital, is fraudulent as to creditors and as to other persons who become creditors during the continuance of such business or transaction without regard to his actual intent."

\*　\*　\*　\*　\*　\*

"Every conveyance made and every obligation incurred without fair consideration when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors."

██ Here conveyances are fraudulent as to present and future creditors, even if the transferor was solvent at the time of the transfers, if the transferor was left with "unreasonably small capital" or if he "intends or believes that he will incur debts beyond his ability to pay as they mature." It is clear that Leo knew at all times between January 1, 1943 and October 1, 1953 that Plaza would be unable to pay the tax claims of the United States if such claims were upheld. (Findings 24, 32, 37, 41, 42) During those years, however, he and the other stockholders, officers and directors authorized transfers of funds to themselves. Indeed, substantial transfers occurred after they had received the adverse decision of the Tax Court (see Finding 42) and such transfers resulted in Plaza's insolvency. The diversion of theatre earnings, payments on cancellation of the sublease and dividends paid by Plaza were fraudulent conveyances under Sections 274 and 275.

Section 276 states:

"Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors."

██ Here, too, the issue is not insolvency. See, e. g., Estate of Stein, 37 T.C. 945 (1962). "Actual intent \* \* to hinder, delay or defraud either present or future creditors \* \* \*" is sufficient to render conveyances fraudulent, and even "fair consideration" cannot save conveyances made under the circumstances proscribed by Section 276. The requisite intent under this section need not be proven by direct evidence but may be inferred (a) where the transferor has knowledge of the creditor's claim and knows that he is unable to pay it; (b) where the conveyance is made without fair consideration; or (c) where the transfer is made to a related party (i. e., husband to wife, corporation to stockholder). See Klein v. Rossi, 251 F.Supp. 1 (E.D.N.Y.1966); Duberstein v. Werner, 256 F.Supp. 515 (E.D.N.Y.1966); Sahley v. Tipton Co., 264 F.Supp. 653 (D.Del.), aff'd, 386 F.2d 450 (3rd Cir. 1967); Gafco, Inc. v. H.D.S. Mercantile Corp., 47 Misc.2d 661, 263 N.Y.S.2d 109 (Civil Ct., N.Y.Co., 1965); cf. Altman v. Finkel, 268 App.Div. 666, 52 N.Y.S.2d 634 (1st Dept.), aff'd mem., 295 N.Y. 651, 64 N.E.2d 715 (1945).

Without enumerating all the instances from which requisite intent may be inferred, it is sufficient to note that defendants were aware of plaintiff's claims,

as well as the state of their own assets, at the time of the transfers; and, more important, defendants' transfers made after the adverse Tax Court decision in 1951 can leave no doubt that they never intended to pay the taxes assessed against Plaza if ultimately they lost their case.

The remedies of a creditor who has been injured by a fraudulent conveyance are set forth in Section 278, as follows:

"1. Where a conveyance or obligation is fraudulent as to a creditor, such creditor, when his claim has matured, may, as against any person except a purchaser for fair consideration without knowledge of the fraud at the time of the purchase, or one who has derived title immediately or mediately from such a purchaser.

"a. Have the conveyance set aside or obligation annulled to the extent necessary to satisfy his claim, or

"b. Disregard the conveyance and attach or levy execution upon the property conveyed.

"2. A purchaser who without actual fraudulent intent has given less than a fair consideration for the conveyance or obligation, may retain the property or obligation as security for repayment."

■ Pursuant to Section 278, the stockholders of Plaza are liable as transferees to the extent of the diverted theatre earnings, payments on resale of the leasehold and dividends.

In addition to the New York Debtor and Creditor Law, transferee liability of the defendants is also predicated upon the New York Stock Corporation Law.

Section 15 of the New York Stock Corporation Law provides as follows:

"No corporation which shall have refused to pay any of its notes or other obligations, when due, in lawful money of the United States, nor any of its officers or directors, shall transfer any of its property to any of its officers, directors or stockholders, directly or indirectly, for the payment of any debt, or upon any other consideration than the full value of the property paid in cash. No conveyance, assignment or transfer of any property of any such corporation by it or by any officer, director or stockholder thereof, nor any payment made, judgment suffered, lien created or security given by it or by any officer, director or stockholder when the corporation is insolvent or its insolvency is imminent, with the intent of giving a preference to any particular creditor over other creditors of the corporation, shall be valid, except as to any rights or interests which may be acquired thereunder by any person without notice or reasonable cause to believe that such conveyance, assignment, transfer, payment, judgment, lien or security would effect a preference.

\* \* \* \* \* \*

"Every person receiving by means of any such prohibited act or deed any property of a corporation shall be bound to account therefor to its creditors or stockholders or other trustees."

■ The Business Corporation Law, McKinney's Consol.Laws, c. 4, took effect on September 1, 1963, and repealed the Stock Corporation Law. However, Section 103(d) of the Business Corporation Law provides:

"This chapter shall not affect any cause of action, liability, penalty, or action or special proceeding, which on the effective date of this chapter, is accrued, existing, incurred or pending, but the same may be asserted, enforced, prosecuted or defended as if this chapter had not been enacted."

Since this action was pending on September 1, 1963, the Stock Corporation Law governs and not the Business Corporation Law.

■ With respect to conveyances or transfers to officers, directors or stockholders, this statute appears to impose controls even more stringent than the Debtor and Creditor Law, supra. Proof of insolvency at the time of a transfer has not been required where such transfers were to corporate di-

rectors, officers or stockholders. Cook v. Walder Grill, Inc., 21 Misc.2d 696, 195 N.Y.S.2d 591 (Sup.Ct. Queens Co., 1959); Potter v. Emerson-Steuben Corp., 248 App.Div.630, 288 N.Y.S. 170 (2nd Dept. 1936); Throop v. Hatch Lithograph Co., 125 N.Y. 530, 26 N.E. 742 (1891). In any event, a showing of "imminent insolvency" is sufficient under the statute and, to the extent it may be relevant, insolvency here applies in its "equity" sense only. In re Elkay Metal Turnings Corp., 190 F.Supp. 660 (E.D.N.Y.1961).

■ As further evidence that Section 15 has been strictly applied, it must be noted that the burden of proving "intent of giving a preference" has been held to be unnecessary where transfers were made to an officer, director or stockholder. Biscayne-Gallowhur Corp. v. Smith, 32 Misc.2d 304 223 N.Y.S.2d 301 (Sup.Ct.N.Y.Co., 1961), modified, 17 A.D.2d 930, 233 N.Y.S.2d 723 (1st Dept. 1962), aff'd, 14 N.Y.2d 629, 249 N.Y.S.2d 177, 198 N.E.2d 369 (1964); Cook v. Walder Grill, Inc., supra; Potter v. Emerson-Steuben Corp., supra. Other cases hold that such intent may be inferred where the director, stockholder or officer received assets with knowledge of the corporation's inability to pay its debts. Jamaica Savings Bank v. Carsons Jamaica, Inc., 23 Misc.2d 612, 198 N.Y.S.2d 787 (Sup.Ct. Queens Co., 1960); New York Credit Men's Ass'n v. Hasenberg, 26 F.Supp. 877 (S.D.N.Y.1938), aff'd, 107 F.2d 1020 (2nd Cir. 1939), cert. denied, 309 U.S. 666, 60 S.Ct. 592, 84 L.Ed. 1013 (1940). It is sufficient to state that transferee liability of defendants arises under this statute because Leo and Jeannette were directors and they were all stockholders of Plaza, with actual or imputed knowledge that Plaza's taxes were unpaid and it was unable to pay them as they matured in the ordinary course of business. This statute allows plaintiff-creditor to compel defendants to account for the transfers made to them.

Under both federal and state law the individual defendants are liable as transferees for plaintiff's claim against Plaza.

## IV.

## PLAZA WAS INSOLVENT IN BOTH THE "BANKRUPTCY" AND "EQUITY" SENSE FROM JANUARY 1, 1943 TO OCTOBER 1, 1953

■ With some possible exceptions in Sections 274–276 of the New York Debtor and Creditor Law and Section 15 of the New York Stock Corporation Law, transferee liability of the individual defendants rests upon the insolvency of the corporate defendant, Plaza, at or near the time that transfers were made.

There are two definitions of insolvency, both of which were illustrated in Kreps v. C.I.R., supra, 351 F.2d at p. 9:

"* * * The equity test of insolvency equates insolvency with a lack of liquid funds, or the inability to pay one's debts in the ordinary course of business as the debts mature. This test normally has the lower threshold of compliance; it may be met by companies in temporary financial difficulty which are not on the verge of failure. The bankruptcy test of insolvency, on the other hand, focuses on the balance sheet of a company at discreet intervals of time in order to determine whether the company's liabilities exceed its assets; it will typically be met by companies in serious financial difficulty."

I have concluded that Plaza was insolvent in both the "bankruptcy" and "equity" sense at all times from January 1, 1943 to October 1, 1953. (Findings 38, 40, 41)

■ The issue of Plaza's insolvency during the relevant period when transfers were made has been sharply contested by defendants who assert, in essence, that tax liabilities assessed at a later time should not be considered in determining Plaza's insolvency during the earlier years to which such tax lia-

bilities are attributed.[9] This assertion, however, is unfounded.

 Mertens, supra, § 53.37, states:

"It is well settled that a transferee is retroactively liable for the transferor's taxes in the year of the transfer and prior years, to the extent of the assets received from the transferor. This is so even though the transferor's tax liability was unknown at the time of transfer."

This rule is logical and fair. Proposed tax deficiencies may be protested by petition to the Tax Court and, in such instances, assessment, levy or collection of the proposed deficiency is prohibited until the matter is decided by the Tax Court. See Int.Rev.Code § 6213(a). Moreover, even in the normal course of events, the government has no knowledge of a taxpayer's transactions until a return is filed, three and one-half months after the taxable year ends. The government cannot possibly audit millions of returns immediately. To permit taxpayers to manipulate assets during the pendency of Tax Court or I.R.S. proceedings and still shield themselves from transferee liability merely because such transfers were made prior to final decisions, would be manifestly unjust. The better result places the government in essentially the same position as that of a private creditor. Successful creditors under both the New York Debtor and Creditor Law and the Stock Corporation Law are not limited to reaching only those assets transferred made after their claims have been reduced to a judgment. Thus, " * * * [I]n determining whether the transferor was insolvent [at the time transfers were made], his liability for Federal income taxes and penalties, even if unknown at the time of the transfer, must be taken into account." Mertens, supra, § 53. 32; see also Robert

Leslie Bowlin, 31 T.C. 188 (1958), aff'd per curiam, Bowlin v. C. I. R., 273 F.2d 610 (6th Cir. 1960); Coco-Cola Bottling Co. of Tuscon v. C. I. R., 37 T.C. 1006 (1962), aff'd, 334 F.2d 875 (9th Cir. 1964); Kreps v. C. I. R., supra.

 Defendants further aver that it is unfair to consider taxes assessed in the determination of Plaza's solvency during the time transfers were made inasmuch as " * * * both taxes and interest are accruable at the end of each year beginning with 1944. It seems plain that there is an inequity in this since the taxes which plaintiff seeks to collect do not reflect the true income of the taxpayer, without an appropriate deduction for interest properly allowable." (Defendants' Memorandum, March 19, 1968, p. 27) The fact that accrued interest might later properly be deductible and thereby affect the tax liability of a future year, however, in no way militates against consideration of such accrued interest for the pupose of determining solvency during the period in which it accrued.

 The basic weakness of defendants' argument is that the United States is deemed a creditor of a taxpayer from the date when the obligation to pay income taxes accrues. Hatch v. Morosco Holding Co., Inc., 50 F.2d 138 (2nd Cir. 1931); United States v. Kaplan, 267 F. 2d 114 (2nd Cir. 1959); see also Viles v. C. I. R., supra; Coca-Coca Bottling Co. of Tuscon v. C. I. R., supra; Kreps v. C. I. R., supra. Thus, the fact that the Tax Court decision on Plaza's 1942, 1943 tax deficiencies was not rendered until February 27, 1951, does not prevent the deficiencies for such years or of the years from 1944 through 1952, together with interest thereon, from being considered as unpaid obligations of the corporation in ascertaining insolvency during the relevant period.

9. Defendants also contend that the value of Plaza's principal asset, the Reade-Brecher lease, must be determined by capitalizing total theatre earnings—not merely those earnings received by Plaza during the existence of the sublease arrangements. With this contention I also do not agree, as stated above in Findings 38, 39.

Defendants have not separated the issue of the accrual of interest in *determining solvency* from the issue of accrual of interest as a *tax deduction*. The long-standing rule with respect to deduction of accrued interest by an accrual-basis taxpayer is that the accrued interest on a disputed tax deficiency may be deducted only in the year in which the dispute is finally determined. G.C.M. 9575, X–1 Cum.Bull. 381 (1931); G.C.M. 25298, 1947–2 Cum.Bull. 39, 141; United States v. Consolidated Edison Co., 366 U.S. 380, 81 S.Ct. 1326, 6 L.Ed.2d 356 (1961).

Pursuant to the forgoing rule, Plaza deducted the accrued interest on the 1943 deficiency on its 1952 tax return after the Supreme Court denied certiorari. (Ex. 29) In 1952, however, it also deducted accrued interest on the anticipated 1944–1949 deficiencies despite the fact that deficiencies for these years were not assessed until 1953. Though this was an improper deduction, the Internal Revenue Service allowed it. Apparently, both Plaza and the Internal Revenue Service must have considered the 1944–1949 deficiencies to be undisputed in 1952. Plaza cannot now be heard to complain that the deduction it improperly claimed was erroneously allowed.

In any event, the fact that accrued interest on tax deficiencies was not deductible for tax purposes until 1952 or thereafter did not in and of itself relieve the defendants of duty to make provision for payment of such interest as it accrued.

## V.

### OTHER CONTENTIONS OF DEFENDANTS

### A. DISALLOWANCE OF $5,000 OF LEO'S SALARY FOR 1944 AS EXCESSIVE

Defendants claim that the Internal Revenue Service disallowed a deduction for compensation paid to Leo in 1944 for his services as President of Plaza and as theatre manager in the amount of $5,000 because of a misunderstanding of the Tax Court's opinion in the proceedings relating to 1943.

In 1943 and 1944, Leo was paid a salary of $6,500 by Plaza and $6,000 by Jeannette, who then held the theatre sublease. After consideration of the facts, the Internal Revenue Service, having attributed Jeannette's 1943 theatre earnings to Plaza, concluded that Leo had received a salary totalling $12,500 in 1943. It was determined that reasonable compensation to Leo was $7,500, and the balance of $5,000 was not an allowable deduction.

In its opinion relating to 1943, the Tax Court stated:

"The fifth issue brings up a rather odd situation. Plaza claimed a deduction on its return for 1943 of $6,500 as salary for Brecher. The Commissioner considered that the $6,000 paid him by Jeannette should be added to the $6,500 paid him by Plaza and recognized as a claim for a deduction of $12,500. He allowed a deduction of $7,500 which is more than the petitioner claimed on its return or in its petition. Since petitioner is not claiming a deduction in excess of that allowed, there is no issue for decision." 16 T.C. at 477)

(The Commissioner acquiesced in this decision. Plaza did not appeal on the salary disallowance issue.) From this statement defendants conclude that the court set aside the Commissioner's disallowance, but I am not in accord with such interpretation.

Defendants have failed to consider Plaza's position as petitioner in the Tax Court. There Plaza was contesting deficiencies proposed by the Internal Revenue Service and there Plaza had the burden of proof. Through its statement that there was "no issue for decision," the

Tax Court implicitly held that Plaza had failed to meet its burden of proof and the court had declined to set aside the salary disallowance. The deficiency had been set forth in the notice of the Internal Revenue Service dated June 14, 1949 under Item (d), "office salary $5,000," (Ex. 21, p. 26) and it also was reflected in a 1951 computation by the parties which had been directed pursuant to Tax Court Rule 50. (See 16 T.C. at 478)

Leo's testimony in the present trial regarding the reasonableness of his 1944 salary has little, if any, probative value, particularly in view of his admission upon cross-examination that he did not even known what the salary was. (180–182) Consequently, the ordinary presumption of correctness of the Internal Revenue Service applies to this disallowed salary deduction, see United States v. Lease, supra, and said presumption is strengthened by the Tax Court decision concerning the preceding year upon the same issue.

### B. ALLEGED INCONSISTENT POSITIONS OF PLAINTIFF

Defendants question plaintiff's right to determine, first, that income derived from the theatre operations constituted dividends, capital gains or return of capital (most of which was taxable to them as partners or individuals) and then, later, determine that such revenue represented transfers made while Plaza was insolvent or which rendered it insolvent.

In order to narrow this issue, it should be made clear at the outset that the mere fact that an individual has paid taxes upon the receipt of funds is no bar to a subsequent assertion by the government that payment of such funds was an illegal transfer. See Estate of Stein, supra. Thus, the core of defendants' objection is their assertion that it is both inconsistent and inequitable for the government to characterize funds received by them as dividends or capital gains and then to seek imposition of transferee liability upon the basis that Plaza was insolvent at the time defendants received the money.

In fact, however, plaintiff's position is not inconsistent at all. The Internal Revenue Code of 1939, § 115(a) (Int.Rev.Code of 1954, § 316(a)) provides that distributions to stockholders are taxable as dividends when paid out of accumulated earnings and profits *or* out of earnings and profits of the particular taxable year. Consequently, in the event that a corporation has earnings in a year during which it is insolvent and still makes a distribution to its stockholders, such a distribution is taxable as a dividend to the extent of the year's earnings.

Likewise, the fact that some of the payments from Plaza to its stockholders were taxable at capital gains rates or were not taxable at all is not inconsistent with Plaza's insolvent condition. Under the Internal Revenue Code of 1939, §§ 115(b) and (d) (Int.Rev.Code of 1954, § 301(c)), such payments are taxable as follows:

(a) As dividends, to the extent of current or accumulated earnings and profits;

(b) As return of capital (non-taxable) to the extent of the stockholder's cost basis in his stock; and

(c) As capital gain thereafter.

Thus, rather than taking conflicting positions, plaintiff has consistently followed the provisions of the Internal Revenue Code.

Finally, defendants' argument that the imposition of transferee liability in this case is wholly inequitable inasmuch as it " * * * would result in taxes far greater than the income taxed * * * " has been considered and discounted. Without in any way passing upon the matter at this time, it appears that Internal Revenue Code, § 1341, may well provide defendants with substantial relief in the year payment is made.

### CONCLUSIONS OF LAW

1. The court has jurisdiction over this action. 28 U.S.C. §§ 1340, 1345; 26 U.S.C. § 7403.

2. Plaintiff, United States of America, is entitled to judgment against defendant Plaza for taxes assessed in the sum of $114,382.28 less the sum of $1,644.51 paid on account thereof plus interest according to law, and costs.

3. Pursuant to 31 U.S.C. §§ 191–192, defendant Leo Brecher is liable for said judgment as transferee of Plaza's assets to the extent of the leasehold payments during the period January 1, 1943 through October 1, 1953, the leasehold surrendered to him on October 1, 1953, and the security deposit thereunder (totalling $219,700). (Findings 42, 46)

4. Pursuant to the New York Debtor and Creditor Law, defendants Leo Brecher, Walter Brecher and Vivian Pack, individually, and Leo Brecher and Walter Brecher, as Executors of the Estate of Jeannette Brecher, are liable for said judgment as transferees of Plaza's assets to the extent of the theatre earnings diverted to them, payments received on resale of leasehold, and dividends, as follows:

| | Leo | Jeannette | Walter | Vivian |
|---|---|---|---|---|
| Theatre earnings | $ 9,859.84 | $124,475.69 | $ 9,859.84 | $ 9,859.84 |
| Resale of leasehold | 3,750.00 | 3,750.00 | 3,750.00 | 3,750.00 |
| Dividends | 13,125.00 | 312.50 | 5,625.00 | 5,625.00 |
| Total | $26,734.84 | $128,538.19 | $19,234.84 | $19,234.84 |

(Findings 42, 46)

5. The defendants are liable for said judgment as transferees to the extent of the assets described in Conclusions 3 and 4 pursuant to Section 15 of the New York Stock Corporation Law.

6. Defendants are not at this time entitled to any recoupment or offset based on the claim that they paid federal income taxes on some of the funds transferred to them. See Int.Rev.Code § 1341; Estate of Stein, 37 T.C. 945, 956–958 (1962).

7. Plaintiff, United States of America, is entitled to judgment:

(a) Against defendant LEO BRECHER for the sum of $114,382.28 less the sum of $1,644.51 paid on account thereof plus interest according to law, and costs, based upon his receipt of the following funds transferred by Plaza:

| | |
|---|---|
| Leasehold payments made during the period January 1, 1943 through October 1, 1943 | $136,700.00 |
| Leasehold surrendered to Leo on October 1, 1953 | 55,000.00 |
| Security deposited by Leo | 28,000.00 |
| Theatre earnings during partnership | 9,859.84 |
| Resale of leasehold | 3,750.00 |
| Dividends | 13,125.00 |
| TOTALLING | $246.434.84 |

(See Finding 46)

(b) Against LEO BRECHER and WALTER BRECHER as Executors of

the ESTATE OF JEANNETTE BRECHER for the sum of $114,382.28 less the sum of $1,644.51 paid on account thereof plus interest according to law, and costs, based upon her receipt of the following funds transferred by Plaza:

Theatre earnings under sub-
lease .....................$114,615.85
Theatre earnings under part-
nership ................... 9,859.84
Sale of sublease ........... 3,750.00
Dividends ................. 312.50

TOTALLING ......$128,538.19

(Finding 46)

(c) Against WALTER BRECHER for the sum of $19,234.84 plus interest [10] and costs based upon his receipt of the following funds transferred by Plaza:

Theatre earnings derived from
the partnership .............$ 9,859.84
Resale of leasehold .......... 3,750.00
Receipt of dividends ........ 5,625.00

TOTALLING ......$19,234.84

(Finding 46)

(d) Against VIVIAN PACK for the sum of $19,234.84 plus interest [11] and costs based upon her receipt of the following funds transferred by Plaza:

Theatre earnings derived from
the partnership .............$ 9,859.84
Resale of leasehold .......... 3,750.00
Receipt of dividends ........ 5,625.00

TOTALLING ......$19,234.84

(Finding 46)

8. Nevertheless, the amount collected on said judgments against Leo Brecher, Walter Brecher, Vivian Pack and the Estate of Jeannette Brecher shall be limited to a total amount not in excess of the judgment against 58th Street Plaza Theatre, Inc., including interest and costs. Though plaintiff is entitled to recover no more than the amount

of the judgment against Plaza, it is not required to marshal its claims "so as to adjust the rights of the various stockholders" to contribution. Phillips v. C.I.R., 283 U.S. 589, 604, 51 S.Ct. 608, 614, 75 L.Ed. 1289 (1931).

Settle judgment on notice pursuant hereto.

10. See Ruderman v. United States, 355 F.2d 995 (2nd Cir. 1966).

11. See Ruderman v. United States, supra.