GLADYS B. TEPLITZ, TRANSFEREE, AND JILL WOLK, TRANSFEREE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent ESTATE OF HARRY S. TEPLITZ (DECEASED), GLADYS B. TEPLITZ, Administratrix, and GLADYS B. TEPLITZ, Surviving Spouse, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Teplitz v. Commissioner
Docket Nos. 9749-75, 10222-75.
United States Tax Court
T.C. Memo 1978-45; 1978 Tax Ct. Memo LEXIS 466; 37 T.C.M. (CCH) 229; T.C.M. (RIA) 780045; January 31, 1978, Filed *466 Decedent, Harry Teplitz, was a sales agent for several corporations whose business was importing and exporting steel. He was compensated on a commission basis. He misappropriated steel belonging to his principals in 1968 and 1969 and sold it through his subchapter S corporation. He did not include the value of the misappropriated steel in gross income reported on the income tax returns filed for 1967, 1968, and 1969 which purported to be joint returns of Harry and Gladys. Gladys did not sign these returns nor did she file separate returns. She had filed joint returns with Harry in preceding years. Held: The returns for the years 1967, 1968, and 1969 were joint returns of Harry and Gladys and both were jointly and severally liable thereon. Held, further: Gladys qualified as an innocent spouse under sec. 6013(e)(1), I.R.C. 1954, for the year 1967 and is relieved from liability for the tax and penalties for that year. She did not qualify as an innocent spouse for the years 1968 and 1969 and is liable for the tax for those years. [1]
Held, further: Jill Wolk, daughter of Gladys by a former marriage, is liable *467 as a transferee to the extent of $686 in checks given to her by Gladys during the years 1969-1971. She is not liable as a transferee as a result of gifts of cash from Harry and Gladys in 1968 nor as a result of Gladys having placed title in a condominium in Jill's name in 1973 which Jill conveyed to Gladys for no consideration in 1975. Sidney A. Soltz, for the petitioners. Thomas M. Cryan, for the respondent. DRENNEN
MEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, Judge: In these consolidated cases respondent determined various amounts of liabilities for various reasons. In docket No. 9749-75 respondent issued notices of transferee liability against Gladys B. Teplitz and Jill Wolk as follows: Addition to tax
Year
Deficiency
6653(b) [2]
Gladys B. Teplitz, Transferee
1967
$24,453.12
$12,226.56
of the assets of the estate
1968
134,067.16
67,033.58
of Harry S. Teplitz, deceased,
1969
166,854.60
83,427.30
transferor
The transferee liability was limited to $82,777.38 plus interest. Jill Wolk, transferee
1967
$18,110.68
$9,055.34
of the assets of the
1968
112,592.23
56,296.12
estate of Harry S. Teplitz
1969
150,046.60
75,023.30
and Gladys B. Teplitz, Sur-
viving Spouse, transferors
*468 The transferee liability was limited to $67,532 plus interest. 2a
Additions to tax
Year
Deficiency
sec. 6653(b)
Jill Wolk, transferee of
1967
$24,453.12
$12,226.56
Gladys B. Teplitz, trans-
1968
134,067.16
67,033.58
feree of the assets of the
1969
166,854.60
83,427.30
estate of Harry S. Teplitz,
deceased, transferor
The transferee liability was limited to $47,500 plus interest. In docket No. 10222-75 respondent determined that the following income tax deficiencies and additions to tax were owed by the estate of Harry S. Teplitz, deceased, and Gladys B. Teplitz, surviving spouse; Additions to tax Year
Deficiency
sec. 6653(b) [3]
1967
$18,110.68
$9,055.34
1968
112,592.23
56,296.12
1969
150,046.60
75,023.30 Since petitioners did not *469 dispute respondent's determination of the deficiencies in tax and additions to tax, the threshold issue presented in docket No. 10222-75 is whether Gladys B. Teplitz intended to file joint income tax returns for the taxable years 1967, 1968, and 1969 even though she did not personally sign those returns. If she did so intend, we must decide whether she may avoid liability for the deficiencies as an innocent spouse pursuant to section 6013(e). Dependent upon these determinations is the question of Jill Wolk's liability for these deficiencies and additions to tax in the amount of $49,311 as a transferee of the assets of the estate of Harry S. Teplitz and Gladys B. Teplitz, surviving spouse. If, however, Gladys B. Teplitz did not intend to file joint returns for the taxable years at issue, we must determine whether she is liable for the deficiencies and additions to tax in the amount of $82,777.38 as a transferee of the assets of the estate of Harry S. Teplitz and whether Jill Wolk is liable for the deficiencies and additions to tax in the amount of $67,532 as a transferee of Gladys B. Teplitz, transferee of the assets of the estate of Harry S. Teplitz. The estate of Harry S. Teplitz *470 has conceded its liability for the deficiencies as determined for the taxable years 1967, 1968, and 1969. [4] *471 For purposes of the innocent spouse issue petitioner does contest the disallowance by respondent of $276,000 worth of merchandise purchased as an offset against gross receipts claimed on schedule C of the joint income tax return filed for Harry and Gladys for 1968. FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitioners Gladys B. Teplitz (Gladys) and Jill Wolk (Jill) resided in Miami Beach, Fla., at the time the petitions were filed in these cases. Gladys was married to Harry S. Teplitz (Harry) from January 2, 1958, until his death on February 9, 1972. She is also administratrix of his estate. Jill is Gladys' daughter by a prior marriage.
During the marriage of Gladys and Harry, Harry's activities constituted their primary source of income. He was also responsible for handling their financial affairs and Gladys permitted him to make all of their financial decisions. Throughout the taxable years 1966 to 1970, Harry was an independent sales agent for Cosid, Inc., Teuter Steel Corporation, Corey Cartage, Inc., Harrington & Company, Inc., and Indussa Steel Co. Payment for his services was made on a commission basis. Cosid and Indussa *472 Steel Co. were in the business of importing and exporting steel. Gladys and Harry also were the sole and equal shareholders of the Dodge Island Steel Co. (Dodge Island). It was incorporated in the State of Florida on May 9, 1967, and elected on May 26, 1967, to be taxed under the provisions of sections 1371, etseq. (subchapter S). Its principal activity was steel sales. The Teplitzes filed joint income tax returns for their taxable years 1964 through 1966. [5] What purported to be joint returns for Harry and Gladys Teplitz for the years 1967, 1968, and 1969 were filed. The purported signature of Gladys B. Teplitz on each of these returns was not signed by Gladys. However, Gladys would have signed these returns personally had Harry asked her to do so. During the years of her marriage to Harry, Gladys did not file a separate return. The joint income tax return for Harry and Gladys for the year 1967 reported *473 dividends totaling $110, gross receipts from business (on schedule C) of $46,627.30, less expenses, for a net profit of $35,685.28, and a net loss from Dodge Island of $34,914.98. Deductions and exemptions exceeded income and taxable income was reported as zero. The business income reported on schedule C was detailed as follows: Cosid, Inc. ($46,627.30 less returns)
$42,649.98
Less Loans
15,076.87
Cosid earnings
$27,573.11
Teuter Steel Corp.
3,550.86
Corey Cartage, Inc.
2,250.74
Harrington & Co., Inc.
13,252.59
$46,627.30 [6]
Commission income and bank deposits in the aggregate amount of $54,352.51 was not reported on the joint return filed for 1967. The small business corporation income tax return (Form 1120S) filed by Dodge Island for the taxable year 1967 reported gross rents of $847.50 and other income and commissions of $5,352. After deducting expenses it reported a loss in taxable income of $34,914.98. The 1968 joint income tax return filed for Harry and Gladys *474 reported income from dividends of $135 (less exclusion of $135), income from Dodge Island of $7,518.70, and a net loss from business (schedule C) of $3,069. Schedule C reported gross receipts of $274,076.45, less merchandise purchased of $276,000 for a gross loss of $1,923.55. Other expenses totaling $1,146 produced the net loss from business of $3,069, other income (net of above) was reported as $4,989.70, less itemized deductions of $3,790.85 and exemptions of $1,200, resulted in no taxable income and no tax due. In 1968, Harry misappropriated from Cosid, Inc., steel which had a minimum fair market value of $141,736.59. [7] *476 Harry sold this steel to Dodge Island in 1968. The value of the misappropriated steel, as such, was not reported as income on the joint return for Harry and Gladys for 1968. By a letter to the president of Cosid, Inc., bearing the date February 14, 1968, Harry admitted misappropriating "approximately $125,000" of Cosid's steel and made arrangements to repay it from future commissions earned secured by a $60,000 second mortgage on his home, a $30,000 first mortgage on a boat, and "approximately $23,000 in cash to be delivered in a week or so." (Since it is *475 stipulated that this steel was misappropriated in 1968 and not discovered by Cosid until 1969, we assume that the date on the letter should have been 1969). Harry charged Dodge Island $119,528.82 for the misappropriated steel, which amount was included in cost of goods sold on Dodge Island's 1968 return. In the notice of deficiency respondent increased Dodge Island's cost of goods sold by $22,207.77 to reflect the fair market value of the steel. In his notice of deficiency to Harry's Estate and Gladys, respondent also reduced the gross receipts reported on schedule C of the 1968 return by $40,924.15 to reflect the correct fair market value of the steel and to include unreported commission income. Respondent also disallowed the entire $276,000 cost of goods sold claimed on schedule C of the individual return for the reason that the amount claimed represented the value of steel which was the property of Cosid, Inc., and Indussa, Inc. "and to which you therefore have no basis." Respondent also decreased income by $23,123 for repayments made by Harry to Cosid in 1968. The small business corporation income tax return filed by Dodge Island for 1968 reported gross receipts of $324,077.46 less cost of goods sold of $205,799.84 for a gross profit of $118,277.62. Also reported was interest income of $1,437.62, gross rents of $868.55, a net loss on sale of capital assets of ($786.77), and other income of $52,737.84. Deductions for expenses totaled $165,016.16, resulting in net taxable income of $7,518.70, which was included on the joint return of Harry and Gladys. The cost of goods sold was merchandise purchased in the amount of $190,031.20 plus freight of $15,768.64 (no opening or closing inventories being reflected). The item "other income" included commissions totaling $47,377.17, warehouse and office service charges of $5,235.48, and discounts of $125.19, for the total of $52,737.84. The 1969 joint income tax return filed for Harry and Gladys reported interest income of $615.25, dividend income of $121 (less exclusion of $121), and a loss from Dodge Island of $51,850.49. No business income and expenses were reported; no schedule C was attached. The return reflected no taxable income and no tax due. *477 In November of 1969, Cosid discovered that Harry had misappropriated additional steel belonging to Cosid and to Indussa Steel Co., having minimum fair market values of $172,885.41 and $50,000, respectively. The joint income tax return for Harry and Gladys for 1969 failed to report these values as income, and also failed to report commission income from Cosid of $29,389.14 and unexplained bank deposits of $13,061.18. In his notice of deficiency respondent included these amounts in income. Respondent also decreased income by $34,696 for repayments made by Harry to Cosid in 1969. The small business corporation income tax return filed for Dodge Island for 1969 reported gross receipts or gross sales of $366,967.33, less cost of goods sold of $406,753.53 for a gross loss of ($39,786.20), a net short-term loss from the sale of capital assets of ($6,078.19), a net long-term loss from the sale of capital assets of ($1,187.95), a net gain from sale of property other than capital assets of $255.10, and "other income" of $284,795.62, for total income of $237,998.38. Deductions for expenses, including a deduction of $156,000 for bad debts, totaled $289,848.87, resulting in a net loss of ($51,850.49), *478 which was included on the joint return of Harry and Gladys. The cost of goods sold, totaling $406,753.53, was comprised of merchandise purchased for sale of $330,328.11 and freight of $76,425.42 (no beginning or ending inventories). The "other income" reported totaling $284,795.62, consisted of commissions totaling $273,302.31, warehouse and office service charges of $11,063.78, and discounts and miscellaneous income of $429.53. In his computation of Gladys' and Harry's income from Dodge Island, respondent determined that Dodge Island had included the steel misappropriated from Cosid and Indussa in 1969 in purchases at a value of $259,000, whereas it had a combined value of only $222,885. He therefore increased distributable income by $36,115. He also disallowed the claimed bad debt deduction of $156,000 for reasons that are not too clear. He also decreased Dodge Island's commission income by $222,885 (the value of the misappropriated steel) for the reason that he had determined that this amount was reportable on the income tax return of the Teplitzes. Gladys was not aware until after Harry's death that he had misappropriated the steel from Cosid and from Indussa Steel. During *479 the years 1967 through 1969, joint brokerage accounts were maintained in the names of Harry and Gladys with Merrill Lynch, Pierce, Fenner & Smith, Inc. , Hayden Stone, Inc., and Purcell, Graham & Co. Brokerage statements for the accounts maintained at Merrill Lynch, Pierce, Fenner, & Smith, and Hayden Stone, Inc., were sent to the address of the Dodge Island Steel Co. Brokerage statements from Purcell, Graham & Co. were sent to Martin Auslander in New York City. Auslander was Harry's accountant. Gladys was not aware until the present litigation that these brokerage accounts had been opened nor was she aware that bonds and securities had been purchased through these accounts in the Teplitzes' names. She personally did not sign the signature card opening the account with Merrill Lynch, Pierce, Fenner & Smith, Inc. During this period of time, the following stocks and bonds were purchased for this joint brokerage account with funds supplied by Harry for the following prices: DATE
STOCKS OR BONDS
PURCHASE PRICE
(a) 6/9/67
N.Y. Central Bonds
$5,017.57
(b) 3/11/68
100 shares United Park
City Mines
941.25
(c) 7/16/68
N.Y. Central Bonds
3,750.57
(d) 7/23/68
N.Y. Central Bonds
4,697.02
(e) 7/23/68
100 shares Siliconix Inc.
3,536.70
(f) 8/6/68
N.Y. Central Bonds
3,076.89
(g) 8/6/68
N.Y. Central Bonds
766.91
(h) 8/16/68
400 shares Advance
Metal Products
2,603.92
(i) 7/30/69
400 shares Sterling
Precision
714.20
(j) 12/4/69
N.Y. Central Bonds
530.38
(k) 12/4/69
N.Y. Central Bonds
4,773.38
(l) 12/11/69
N.Y. Central Bonds
2,065.00
(m) 12/11/69
N.Y. Central Bonds
1,548.75
(n) 12/26/69
N.Y. Central Bonds
$5,343.06
(o) 12/30/69
N.Y. Central Bonds
1,473.38
(p) 6/13/69
100 shares Waltham
Ind. Inc.
2,380.50
(q) 4/7/69
100 shares Sterling
Precision Corp.
903.38
(r) 6/3/68
10 shares Bethlehem Steel
318.25
(s) 5/29/68
10 shares U.S. Steel
387.50
(t) 1969
100 shares Harvey Aluminum
2,700.00
(u) 1969
200 shares Walter E. Heller
2,400.00
*480 Most of these stocks and bonds were held either in street name or in the joint names of Harry S. Teplitz and Gladys B. Teplitz. [8]
The Teplitzes maintained a safe deposit box in their joint names with the Second National Bank of North Miami. They also maintained a safe deposit box with a bank in Chicago, but Gladys did not discover it until after Harry's death. Harry also had a safe at the business location of the Dodge Island Steel Co. At least some of the New York Central bonds were kept in the safe deposit box at the Second National Bank of North Miami because Harry gave these bonds to Gladys with instructions to put them there. Twice a year Gladys entered this safe deposit box to clip the interest coupons from the bonds and cash them. Gladys entered this box numerous times during the taxable years at issue. The entrance record maintained *481 by the Second National Bank of North Miami indicates that Gladys entered the box 6 times in 1967, 5 times in 1968, and 8 times in 1969. She also entered the box twice in 1970, and once in 1971 and 1972. She entered the box on February 15, 1972, several days after Harry's death, but she claims the box was empty. Gladys did not know what Harry kept in the safe at Dodge Island's office. During 1968 and 1969 on the dates specified Harry purchased the following items of jewelry and furs and gave them to Gladys: Date Item
purchased
Price
a. Ladies' diamond pin
4/6/68
$4,000.00
b. Ladies' diamond ring
2/3/68
1,100.00
c. Ladies' diamond ring
10/29/68
2,150.00
d. Ladies' gold ring
6/19/69
275.00
e. Ladies' turquoise and diamond
ring
6/11/69
187.20
f. Diamond earrings
5/4/68
1,300.00
g. Special order watch
11/29/68
1,140.00
h. White mink twist
12/4/68
260.00
i. Eliodoro ring
1969
1,600.00
The jewelry was usually kept in a box in a transept in the ceiling of the Teplitzes' home but on some occasions it was kept in the safe deposit box maintained at the Second National Bank of North Miami. Of these items of jewelry listed above, according to Gladys, a, b, c, f, and i could not be located after Harry's death. *482 Item e was lost by Gladys during a move. On March 8, 1968, Harry purchased a residence located at 2005 N.E. 212st Road, North Miami, Fla., and caused title to be taken in the names of Harry and Gladys as tenants by the entirety. The purchase price was $60,000, and Harry made a downpayment of $20,000. Gladys did not contribute any of her own personal funds to purchase the residence but she later acquired title by operation of law at Harry's death. The original mortgage of $40,000 was reduced to $36,475 as of December 31, 1971. All of the mortgage payments were made either by Harry or with funds furnished by him. In 1969 Harry executed a note for $60,000 secured by a second mortgage on the house in favor of Cosid, Inc. [9] Gladys personally did not sign the second mortgage. Harry wrote checks drawn on individual bank accounts maintained by him and payable to Gladys as follows: Manufacturers Hanover Trust
Account #5-33754 DATE
CHECK #
AMOUNT
(a) 7/5/67
207
$500.00
(b) 10/2/67
352
500.00
(c) 11/1/67
348
620.00
(d) 12/1/67
362
550.00
(e) 10/5/67
599
230.00
(f) 1/3/68
401
500.00
(g) 6/4/68
440
500.00
Second National Bank
Account #200-163-3
(h) 4/1/68
685
$1,600.00
(i) 5/18/68
777
100.00
(j) 4/12/68
723
1,000.00
(k) 9/17/68
855
200.00
(l) 11/26/68
866
200.00
(m) 8/4/69
1155
75.00
(n) 8/18/69
1158
100.00
(o) 9/8/69
1160
50.00
(p) 9/30/69
1164
1,000.00
(q) 11/17/69
1171
50.00
*483 Harry and Gladys maintained a joint checking account at the First National Bank of Bay Harbor Islands. All deposits to this account were made by Harry or with funds supplied by Harry. Several of the checks drawn on Harry's individual accounts, payable to Gladys, were deposited in this joint checking account as follows: BANK
CHECK #
AMOUNT
Manufacturers Hanover Trust
440
$500.00
Second National Bank
777
100.00
Second National Bank
855
200.00
Second National Bank
866
200.00 [10]
The source of some of the funds deposited in this account might have been interest or dividends from bonds and securities jointly held by the Teplitzes. The deposits to the joint checking account were made to cover household expenses, food, clothing for Gladys, and other miscellaneous items. Gladys wrote checks on this account as follows *484 as reflected on Joint Exh. 19-S. 1968
1969
1970
1971
Jordan Marsh
$ 638.00
$ 129.00
$110.00
Alco Decorators
302.00
Sears Roebuck
35.00
Maxwell Venetian Blind
70.00
Spolter Lighting
223.00
Saks Fifth Avenue
514.00
250.00
$ 320.00
Master Furniture Refinisher
167.00
Miami Gallaric
89.00
ABC Outlet
78.00
Fashion Studio
104.00
Andrew Gella
42.00
58.00
Mulcahy Antiques
16.00
Moseleys
214.00
Closet Decor
99.00
Doria Marble
132.00
Sara Frederick
130.00
62.00
53.00
David Balogh Inc.
160.00
207.00
18.00
Stagg Shop
54.00
Martha Inc.
172.00
Shoe Rack
53.00
Adrian Thal
260.00
16.00
Tops & Bottoms
115.00
96.00
Martha of Miami Beach
76.00
199.00
265.00
67.00
14 St. Fabric Bazaar
122.00
Pier 66 Restaurant
125.00
Burdines
114.00
289.00
35.00
Florio Rosati Inc.
52.00
Experiment #2
110.00
Elizabeth Arden
213.00
35.00
Honey Boutique
170.00
Neiman Narcus
63.00
141.00
Minos Women Club
40.00
Lillie Rubin
156.00
99.00
Glamor Pants
130.00
Cash - Gladys Teplitz
2,250.00
1,400.00
950.00
2,200.00
Jill Wolk
625.00
485.00
50.00
151.00 [11] *485 Gladys characterized 1968 and 1969 as two of the best years of her marriage. On September 3, 1968, Harry gave $500 to Jill. [12] Gladys, with funds supplied by Harry, gave her daughter the following amounts of cash during the following years: Year
Amount
1968 $625
1969
485
1970
50
1971
151
Gladys made these gifts because her daughter was dependent upon alimony for her support and because her grandchild was an asthmatic who required medical attention. At the close of the taxable years 1967 through 1971, the Teplitzes' known assets and liabilities, including the income tax deficiencies and additions to tax for those years determined by respondent in the notice of deficiency, were as follows: Schedule of Assets and Liabilities
1967
1968
1969
1970
1971
Assets: Residence 2005 N.E. 121 Rd.
$ 60,000.00
$ 60,000.00
$ 60,000.00
$60,000.00
Land Lots 5 & 6 Myerson Heights
27,086.00
Cash in Banks: Second Nat'l Bank - Jt. Checking Account
$ 594.00
404.00
906.00
Second Nat'l Bank - Harry Teplitz
477.00
4,970.00
3,173.00
Manufacturers Hanover Trust - Jt. Checking Account
3,342.00
207.00
114.00
3,628.00
Stocks and Bonds
5,018.00
20,079.00
24,832.00
Paid-in-capital - Dodge Island Steel
5,000.00
5,000.00
5,000.00
Loans receivable - Dodge Island Steel
53,297.00
77,404.00
27,000.00
27,000.00
Automobiles
4,779.00
8,513.00
8,039.00
8,870.00
9,386.00
Houseboat
30,000.00
Boat
4,810.00
4,810.00
4,810.00
Cash surrender value of Life Insurance
4,000.00
4,000.00
Account Receivable - Kate Kaplan
2,500.00
Total Assets
72,507.00
233,663.00
133,874.00
108,308.00
80,696.00
Liabilities: Income Tax
18,111.00
112,592.00
150,047.00
Penalties
9,055.00
56,296.00
75,023.00
Unpaid Tax and Penalties from prior years
27,166.00
196,054.00
421,124.00
421,124.00
Value of Misappropriated Steel - Cosid
141,737.00
172,885.00
Value of Misappropriated Steel - Indussa
50,000.00
51,884.00
Less Repayments
(23,123.00)
(34,696.00)
Unrepaid balance of misappropriated steel from prior years
118,614.00
306,803.00
358,686.00
Mortgage on residence - First Federal Savings
38,137.00
37,559.00
36,835.00
36,475.00
Mortgage on land - lots 5 & 6 Myerson Heights - Shellmark Realty
13,500.00
12,000.00
Mortgage on Auto
4,041.00
Loan Second National Bank
13,000.00
Claudio Pedezzani
97,000.00
97,000.00
97,000.00
Loan - Abraham Shapiro
5,000.00
Miscellaneous Debts
4,709.00
Total Liabilities
27,166.00
366,305.00
887,486.00
913,646.00
927,035.00
Insolvency
132,642.00
753,612.00
805,338.00
846,339.00
*486 Gladys' income after her husband's death was $187.10 per month from Social Security and $73.20 per month from a Veterans' Administration life insurance policy. She was the beneficiary of a $30,000 life insurance policy, proceeds of which were used to pay Harry's debts and Gladys' expenses during the year following Harry's death. About a year after Harry's death Gladys sold for approximately $100,000 the house which she had received on Harry's death by right of survivorship. She thereafter purchased a condominium with $47,500 of the sales proceeds. She had legal title to the condominium taken in Jill Wolk's name but retained possession for herself. Jill was married in June 1975, and a month or two later title to the condominium was conveyed to Gladys for no consideration. Gladys subsequently sold the condominium retaining all of the sales proceeds. The notice of deficiency and notices of transferee liability were sent to petitioners by certified mail on September 12, 1975. OPINION The first issue we must decide is whether Gladys filed joint income tax returns with her husband for the taxable years 1967, 1968, and 1969, thereby rendering her jointly and severally liable for the *487 deficiencies determined for those years, [13] absent protection from liability as an innocent spouse pursuant to section 6013(e). [14]
We believe it is clear from the evidence that these returns were intended to be joint returns, and we so conclude. Gladys' argument that the returns for 1967, 1968, and 1969 were not joint returns because she did not sign them is without merit because of the manner in which the Teplitzes handled their financial affairs. It is well settled that the absence of the signature of one spouse does not prevent realization of their intention to file a joint return if the facts of the particular case support a finding that this was their intention. The intent of the parties is of course a question of fact. The fact that the couple has a history of filing joint returns and that the nonsigning spouse relies upon the other to make their financial decisions is evidence that returns filed as joint returns were intended as such. Estate of Campbell v. Commissioner,56 T.C. 1, 12 (1971); O'Connor v. Commissioner,412 F. 2d 304 (2d Cir. 1969), affg. on this issue a Memorandum Opinion of this Court; Federbush v. Commissioner,34 T.C. 740 (1960), *488 affd. per curiam 325 F. 2d 1 (2d Cir. 1963). Gladys' testimony leaves us with little doubt that she intended the contested returns to be joint returns. She always deferred to and relied upon her husband's advice and desires with regard to their financial affairs. Moreover, she testified that she would have signed the contested returns herself if Harry had so requested and she had done so on the joint return filed for their taxable year 1964. Joint returns had been filed for their taxable years 1965 and 1966, possibly without Gladys' signature. [15] *489 Gladys' reliance upon her husband and her evident lack of interest through the years in their tax matters is strongly indicative that she consented to Harry's actions in 1967, 1968, and 1969. As was stated in Estate of Campbell v. Commissioner,supra at p. 13: The absence of her signature is hardly of overriding importance. Her signature on prior and subsequent returns appears to have been little more than a formal ritual as far as she was concerned. She left the responsibility for preparation and filing of the returns to her husband. She intended the returns to be filed as he chose. * * * Further evidence that these returns were intended to be joint returns is the fact that Gladys did not file separate returns for these years despite the fact that income to which she was entitled as joint owner of various stocks and bonds was reported in the returns (the interest represented by the coupons she personally clipped and cashed having come into her possession), her share of the income and losses of Dodge Island was reported on the returns, and deductions for her share of the real estate taxes and interest on the mortgage on the home that was jointly owned by Harry and Gladys were claimed on the returns. The caption on the returns bore both of their names, and exemptions were claimed for both spouses. Gladys did not testify that she did not intend the returns to be joint returns or that she would have refused to sign them had they been presented to her for her signature. On the contrary, Gladys indicated that all matters pertaining to the financial affairs of the family were left up to Harry and that she expected him to take care of them. And finally, *490 we note that this issue was not raised until after the revenue agents had completed their audits and after Gladys had signed several consents extending the time for assessing the taxes. While we recognize that filing consents is not necessarily indicative of an intent that returns were joint, [16] it does suggest that this defense was raised by Gladys' attorney rather than being based on her subjective thinking. We have also held that where a husband filed a joint return, without objection of the wife, who failed to file a separate return, it will be presumed that the joint return was filed with the tacit consent of the wife. Howell v. Commissioner,10 T.C. 859 (1948), affd. per curiam 175 F. 2d 240 (6th Cir. 1949). This tacit consent rule is primarily applicable where respondent determined that the returns were joint returns. See Hennen v. Commissioner,35 T.C. 747 (1961). We believe the rule is particularly applicable here. We conclude and hold that the returns for the years 1967, 1968, and 1969 were the joint returns of Harry and Gladys and under section 6013(d)(3) the liability thereunder is joint and several. Our *491 conclusion that the returns filed for 1967, 1968, and 1969 were intended to be joint returns necessitates decision whether Gladys was an innocent spouse entitled to protection from liability for the deficiencies determined for those years by virtue of section 6013(e). Section 6013(e)(1) sets forth three conditions satisfaction of which entitles the spouse to relief from liability for deficiencies in joint returns. These conditions are: (A) a joint return has been made under this section for a taxable year and on such return there was omitted from gross income an amount properly includable therein which is attributable to one spouse and which is in excess of 25 percent of the amount of gross income stated in the return, (B) the other spouse establishes that in signing the return he or she did not know of, and had no reason to know of, such omission, and (C) taking into account whether or not the other spouse significantly benefited directly or indirectly from the items omitted from gross income and taking into account all other facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such omission, * *492 * *. All of these conditions must be satisfied for each of the taxable years at issue, Adams v. Commissioner,60 T.C. 300, 303 (1973); Sonnenborn v. Commissioner,57 T.C. 373 (1971). The spouse seeking relief under section 6013(e) has the burden of proving that she qualifies for such relief. Fox v. Commissioner,61 T.C. 704, 716 (1974); Adams v. Commissioner,supra;Sonnenborn v. Commissioner,supra.[17]
With regard to the taxable year 1967, neither party appears to question that amounts properly includable in gross income were omitted from this return, that the omitted amounts are attributable to Harry's activities, and that the omitted amounts exceed 25 percent of the amounts shown on the return for that taxable year. Petitioners' briefs do not discuss specifically the applicability of the remaining two conditions of section 6013(e)(1)(B) *493 and (C) to 1967. However, the record gives us an ample basis with which to reach a decision with regard to these conditions without discursive assistance from petitioners. [18]
We are satisfied from the record in this case that Gladys had no actual knowledge that Harry omitted reporting more than $50,000 gross income on their 1967 return. She never saw nor signed this return, and she had no actual involvement in the business or financial activities conducted by Harry. But to satisfy her burden of proof with regard to whether she had reason to know in 1967 of the omitted income, Gladys must establish that a reasonably prudent taxpayer with her knowledge of the family's *494 finances would have no reason to know of the omissions. However, the statute does not require a finding that the other spouse was completely without fault and could not possibly have discovered the omission. Sanders v. United States,509 F. 2d 162, 166-167 (5th Cir. 1975); Mysse v. Commissioner,57 T.C. 680, 698-699 (1972). We believe she has carried this burden of proof for 1967. Since Gladys did not see the 1967 return and thus did not know how much income was reported, we must look to other circumstances to determine whether she had reason to know of the omissions. We find no circumstances revealed by the evidence that we believe should have put her on notice. While we have no evidence of the Teplitzes' standard of living prior to 1967 to compare with their standard of living in 1967, we find no indication that their standard of living either increased or was so lavish in 1967 as to make Gladys aware that Harry's income increased in that year. The new home was not purchased until 1968, and Harry did not give Gladys any of the jewelry until 1968. Aside from whatever cash he may have given her, Harry deposited only $1,000 in the joint bank account at the First National Bank of *495 Bay Harbor Islands which Gladys used to pay for household expenses, food, clothing, and other miscellaneous items. The balances in the account were not large. The Teplitzes did not acquire any assets, except about $5,000 in New York Central bonds, nor incur any liabilities that Gladys knew about or should have known about in 1967. We do not believe Gladys had any reason to know or suspect that Harry had additional income in 1967 that he was not reporting on his tax return. Nor do we find that Gladys benefitted from the omitted income in 1967 to such an extent that it would be inequitable to relieve her of liability for the taxes and penalties arising out of Harry's omissions of income from the 1967 return. While it is impossible to determine from the evidence whether any of the assets which Gladys acquired from or through Harry in subsequent years can be traced to the income omitted from the 1967 return, we are satisfied that any amounts used for such purposes were minimal and that it would be inequitable to hold Gladys responsible for the tax and penalties for 1967. However, the picture changed in 1968. But before examining the evidence with respect to Gladys' knowledge of *496 and benefit from Harry's omissions of income for 1968, we must first determine whether the requirements of subparagraph A of section 6013(e)(1) are met; i.e., whether there was omitted from gross income an amount properly includable therein which was in excess of 25 percent of the amount of gross income stated in the return. Although obfuscation surrounds the presentation, Gladys launches a two-pronged argument with respect to this issue, which we will discuss later. Since neither petitioner disputed respondent's determination of the underlying tax liability, we have little evidence of how the misappropriated steel was handled by Harry and Dodge Island accounting-wise or just how respondent determined that Harry had omitted commission income. All we have are the tax returns, the revenue agents' report, and the notice of deficiency. However, Gladys had the burden of proving not only error in respondent's adjustments to taxable income, but also the omission of an amount in excess of 25 percent of gross income, so we must accept respondent's analysis of the transactions. As recited in our findings of fact the 1968 joint return filed for Harry and Gladys reported gross income from *497 dividends of $135, income (net) from Dodge Island of $7,518.70, and a net loss from business (schedule C) of $3,069. On schedule C, there was reported gross receipts or sales from a business labeled as "sales promotion - steel" of $274,076.45. Deducted from this to arrive at gross profit or loss was an item of $276,000 for merchandise purchased. In the notice of deficiency respondent determined that the taxpayers received business income in the amount of $233,152.30 in 1968 in lieu of the $274,076.45 reported on the return, thus reducing income by $40,924.15. However, respondent also disallowed the entire amount of the purchases, $276,000, because this represented the value of steel owned by Cosid and Indussa, in which taxpayers had no basis. We have no way of knowing what comprised the $274,076.45 of gross receipts reported on the return. The details of the $233,152.30 of business income determined by respondent included commission income of $85,101.97 from Cosid (which included $23,139.10 earned but withheld by Cosid as repayment on misappropriated steel), $3,394.83 from Corey Cartage, $2,918.91 from Harrington & Co., and income from steel misappropriated from Cosid in the *498 amount of $141,736.59. The latter figure is the value placed on the misappropriated steel by Cosid, which we have accepted. The return of Dodge Island for 1968 reported gross receipts or sales of $324,077.46 less cost of goods sold of $205,799.84, with no beginning or ending inventories. In the notice of deficiency respondent adjusted Dodge Steel's distributable income by increasing its purchases by $22,207.77, resulting in revised distributable loss of $14,689.07 rather than income of $7,518.70 as reflected on the return. The explanation of this adjustment was that misappropriated steel valued at $141,736.59 was recorded on the books at $119,528.82 for 1968, so the difference was added to purchases for 1968. Trying to fit the pieces together from the above information, we deduce that Harry did not include in personal income the value of the steel misappropriated in 1968, but probably did include $119,528.82 in business income from the sale of the misappropriated steel to Dodge Island, since that is the cost of the steel recorded on Dodge Island's books. The remaining $154,547.63 of gross receipts reported on schedule C of the joint return may have included commissions or the *499 sales price of misappropriated steel sold to someone other than Dodge Island. In any event, the joint return reported gross receipts from business of $274,076.45, dividend income of $135, and net income from Dodge Steel of $7,518.70, or total gross income of $281,730.15, whereas respondent determined that the taxpayers should have reported gross income of $233,152.30 from business and a loss instead of income from Dodge Steel. Thus, according to respondent's determination, the joint return did not omit any gross income, much less the 25 percent required by section 6013(e)(1)(A), so Gladys does not qualify for relief under section 6013(e) on that ground alone. As we understand Gladys' argument with respect to the omitted income for 1968, it is (1) that the computation of the amount of gross income actually reported on the joint return must be reduced by the $276,000 cost of goods sold as claimed, thus leaving gross income reported from business of zero, and (2) that somehow respondent is attempting, subsequent to trial, to change his valuation of the misappropriated steel, which he cannot do at this stage of the game. With respect to the second argument above, we find no change in *500 respondent's position. He determined in the notice of deficiency that the value of the steel misappropriated by Harry in 1968 was $141,736.59 and he continues to rely on that figure. With regard to petitioners' first argument above, they do not point out just how the argument would affect the issue involved, even if it is valid. They state on brief [19] that Harry converted the steel, which gave rise to income of $276,000, and then sold the same and retained the proceeds, which also gave rise to $276,000 income but with a cost basis of $276,000 flowing from the original conversion of the steel. We assume that the main thrust of this argument is that the $276,000 cost of goods sold claimed on the return should be allowed as a reduction of the gross income reported on the return so that the gross income reported on the return was virtually zero, whereas $276,000 should have been reported but was omitted. First, we do not know what the figure of $276,000 claimed on the return consists of; logically, it could not consist of more than $119,528.82 for the value of the misappropriated steel (the cost reported by Dodge Steel) or the $141,736.59 value placed thereon by Cosid and respondent. *501 Second, the value of the steel was not reported as personal income; only the gross receipts from the sale to Dodge Steel was reported, and respondent treated the transaction the same way. This method of reporting the transaction would result in the Teplitzes obtaining no cost basis in the steel. Cf. O'Meara v. Commissioner,8 T.C. 622, 633 (1947). Sec. 1.61-2(d)(2), Income Tax Regs. But even if petitioners prevailed in their argument that cost of goods sold should be allowed, this would be of no benefit to them so far as the innocent spouse provisions are concerned. An overstatement of cost of goods sold does not result in an omission of an amount *502 properly included in gross income within the meaning of section 6013(e)(1)(A). Section 6013(e)(2)(B)[20] directs us to section 6501(e)(1)(A) [21] *503 in determining whether there has been an omission from gross income for purposes of section 6013(e)(1)(A). Section 6501(e)(1)(A)(i) contains a special definition of gross income [22] *504 which effectively requires us to disregard omissions from gross income resulting from overstatements of cost of goods sold. Because of the cross reference to section 6501(e)(1)(A), there must be an omission of gross receipts from the return before section 6013(e)(1)(A) becomes applicable. [23] In this case the gross receipts from sales of the misappropriated steel to Dodge Island were reported on the 1968 joint return. Consequently, there was no omission of an amount properly includable in gross income on the Teplitzes' 1968 return in this context. [24] *505 Turning now to 1969, the parties again apparently concede without discussion that the omissions from gross income attributable to Harry in 1969 exceeded 25 percent of the amount of gross income shown on the 1969 joint return. We again conclude for the reasons set forth in our discussion of the taxable year 1967 that Gladys had no actual knowledge of the omissions in 1969. However, the picture changes somewhat with regard to whether Gladys should have known about the omission of $265,335.32 gross income. With regard to whether Gladys should have known of the omissions, we reiterate that she must establish under an objective standard that a reasonably prudent taxpayer with Gladys' knowledge of the Teplitzes' finances would have had no reason to know of the omissions. Sanders v. United States,supra.
Gladys characterized 1969 as one of the best years of her marriage. Harry gave her in 1969 three items of jewelry, one of which was very expensive. She continued to receive, *506 somewhat erratically, a generous allowance which she spent on household expenses, clothing, and gifts. This allowance was supplied by checks drawn on Harry's individual checking account or with other funds supplied by him. Several more New York Central bonds were acquired in 1969 and Gladys was aware of at least some of these acquisitions because she clipped and cashed the interest coupons. A substantial number of securities also were acquired in 1969 although Gladys testified that she did not know of these transactions until after Harry's death in 1972. This testimony is credible given that brokerage statements were sent to the address of Dodge Island or Martin Auslander in New York. Also Harry maintained a safe deposit box in Chicago and a safe at Dodge Island's office in which these securities could have been placed, so it is conceivable that Gladys did not know that securities were being acquired in 1969. Be that as it may, 1969 was preceded by 1968--also characterized as one of the best years of her marriage to Harry. In 1968 Harry had given Gladys numerous items of jewelry in addition to the cash he deposited in the joint account for her use. He also acquired a house for *507 $60,000, an automobile for $8,500, and a houseboat for $30,000, all of which she must have been aware of. In 1969, in addition to the additional jewelry he gave her, Harry also acquired a boat for $4,800. While we cannot say that such expenditures for 2 consecutive years were unusual or lavish, see Mysse v. Commissioner,supra, particularly in light of the fact that Harry's income was from commissions, which might vary considerably from year to year, we do believe that this increase in living standard should have put Gladys on notice that their income had increased considerably over the 1967 level. And we do not believe a spouse, knowing of such increase in standard of living, should be entitled to disclaim any "reason to know" about omitted income by simply failing to make inquiry about the finances of the community. Since Gladys was the joint owner of income-producing property, she had an obligation to make certain that the income was being reported. We have no reason to believe that Harry would not have discussed their financial affairs with Gladys had she inquired. We do not believe that the deliberately unknowledgeable spouse whose other spouse makes no effort to deceive *508 her or him was intended to be the recipient of the relief granted by the innocent spouse statute. See Sonnenborn v. Commissioner,supra.
However, the most difficult hurdle for Gladys to clear before she can avail herself of the relief afforded by section 6013(e) for either 1968 or 1969 is the requirement of subparagraph (C), and she fails to clear it. Section 6013(e)(1)(C) requires a determination of whether Gladys significantly benefitted from the income omitted from the 1968 and 1969 returns and whether, taking into account all other facts and circumstances, it is inequitable to hold her liable for the tax. A determination under this provision is subjective and essentially factual. Allen v. Commissioner,61 T.C. 125, 130 (1973), revd. on other grounds 514 F. 2d 908 (5th Cir. 1975). As explained in the House Report: It is not intended that the term "benefit" * * * include ordinary support of the innocent spouse. Unusual support or transfers of property to the spouse would * * * constitute "benefit" and should be taken into consideration in determining whether the spouse benefited from the items omitted from gross income. Such "benefit" may be received by the spouse several years *509 after the year in which the omitted item should have been included in gross income. * * * A mere finding that the spouse "benefited" from the items omitted from gross income will not be sufficient however, to prevent that spouse from obtaining relief from liability for the tax. For the spouse to be prevented from obtaining relief there must also be a finding that the benefit was "significant" and that "taking into account all other facts and circumstances" it is not "inequitable to hold the * * * spouse liable for the deficiency in tax * * *." [H. Rept. 1734, 91st Cong., 2d Sess., pp. 3-4 (1970); see also sec. 1.6013-5(b), Income Tax Regs.] Gladys does not attempt to trace the income items omitted from the 1968 and 1969 returns and show that she received none of it. [25] During 8 months in 1968 Gladys spent $6,732, and during 4 months of 1969 she spent $3,175, mostly for clothes for herself and furnishings for the house, with funds supplied by Harry.During those 2 years Harry gave her jewelry that cost at least $12,272. He also paid the premiums on two life insurance policies under which Gladys was the beneficiary and received the benefits. Harry also bought a home and made payments *510 on the mortgage, which home passed to Gladys by operation of law on Harry's death. While Gladys testified that the safe deposit box and the box in which the jewelry was at times kept at home were both empty when she opened them after Harry's death, we have our doubts about this. It would have been much more convincing had Gladys had someone with her to inventory the contents of these boxes after Harry's death. Based on the facts that we have been able to glean from the record and Gladys' failure to establish by convincing evidence that she did not benefit from the omissions, with some reluctance we hold that Gladys does not satisfy section 6013(e)(1)(C) for 1968 and 1969. We conclude that Gladys is not an innocent spouse entitled to relief pursuant to section 6013(e) and is liable for the deficiencies determined for the taxable years 1968 and 1969. [26] *511 We now turn to respondent's contention that Jill Wolk is liable for the deficiencies and additions to tax for the taxable years at issue under section 6901(a)(1)(A)(i) [27] *512 as a transferee of the assets of the estate of Harry Teplitz and Gladys Teplitz in the amount of $49,311. Her transferee liability is founded upon the cash gifts made to Jill by Gladys and Harry from 1968 through 1971 and the conveyance in 1973 of legal title to the condominium purchased by Gladys with the proceeds of the sale of the home she received at Harry's death by right of survivorship. Because section 6901(a)(1)(A)(i) merely provides a secondary method for enforcing the existing liability of the transferor, the substantive question of whether a transferee is liable for the transferor's obligations depends upon State law, in this instance, Florida law. Commissioner v. Stern,357 U.S. 39, 45 (1958); C.B.C. Super Markets, Inc. v. Commissioner,54 T.C. 882, 898 (1970). The burden of establishing that Jill is liable as a transferee of the assets of the estate of Harry Teplitz and Gladys Teplitz is placed upon respondent by section 6902(a). C.B.C. Super Markets, Inc. v. Commissioner,supra.
The statutory liability in Florida of a transferee of a fraudulent conveyance is set forth in section 726.01, Fla. Stat. Ann. (West 1969): Every * * * gift, grant, * * * conveyance [or] transfer * * * and of goods and chattels, * * * by writing or otherwise, * * * which shall at any time *513 hereafter be had, made or executed, contrived or devised of fraud, covin, collusion or guile, to the end, purpose or intent to delay, hinder or defraud creditors or others of their just and lawful actions, suits, debts, accounts, damages, demands, penalties or forfeitures, shall be from henceforth as against the person or persons * * * his, her or their successors, executors, administrators and assigns, and every one of them so intended to be delayed, hindered or defrauded, deemed, held, adjudged and taken to be utterly void, frustrate and of none effect, any pretense, color, feigned consideration, expressing of use or any other matter or thing to the contrary notwithstanding; provided, that this section, or anything therein contained, shall not extend to any estate or interest in lands * * * [or] goods or chattels which shall be had, made, conveyed or assured if such estate shall be, upon good consideration and bona fide, lawfully conveyed or assured to any person or persons, or body politic or corporate, not having at the time of such conveyance or assurance to them made any manner of notice or knowledge of such covin, fraud, or collusion as aforesaid, anything in this section to *514 the contrary notwithstanding. As a general rule, for a fraudulent conveyance to occur, there must be a creditor to be defrauded, a debtor intending fraud, and a conveyance of property which is applicable by law to the payment of the debt due. Bay View Estates Corporation v. Southerland,114 Fla. 635, 154 So. 894, 900 (1934). However, even though the presumption is against the existence of fraud, where the parties involved in an alleged fraudulent transfer are closely related, such relationship tends to establish a prima facie case and the transaction is regarded with suspicion. Scott v. Dansby,334 So. 2d 331, 333 (Fla. App. 1976). A fraud upon creditors consists of the intention by the debtor to prevent his creditors from recovering their debts by withdrawing his property from their reach. Bay View Estates Corporation v. Southerland,supra.However, when a transfer between closely related parties is made without consideration, it does not matter whether their intention was to hinder or delay creditors. When that was the result of such a conveyance, the real motive of the parties is immaterial. Weathersbee v. Dekle,107 Fla. 517, 145 So. 198, 200 (1933); 16 Fla. Jur., Fraudulent *515 Conveyances, Etc., sec. 9; see Stelle v. Dennis,104 Fla. 438, 140 So. 194, 195 (1932). While our research fails to reveal a specific judicial explanation of the phrase "delay, hinder or defraud," as used in the Florida statute, it is clear that to fall within the meaning of that language the transferor must be insolvent or rendered insolvent by the transfer unless the creditor is a judgment creditor. Weathersbee v. Dekle,supra;Bay View Estates Corporation v. Southerland,supra;Greenv. Casper,346 So. 2d 1204 (Fla. App. 1977). Unfortunately, "insolvency" apparently is undefined by the Florida courts in the context of an alleged fraudulent conveyance. However, two Florida decisions adopted the equity definition of insolvency (present inability to pay debts as they fall due in the ordinary course of business) in other contexts, see Bartholomew v. Glen Falls Insurance Group,241 So. 2d 698 (Fla. App. 1970), and Williams v. American Crafts,129 So. 2d 165 (Fla. App. 1961). See also sec. 607.004(14), Fla. Stat. Ann. (West 1977). Quite possibly, this definition of insolvency would be applied to section 726.01, Fla. Stat. Ann.
We recognize that the bankruptcy definition of insolvency *516 (liabilities exceed assets at the time of transfer) has been used as the appropriate test of insolvency in transferee liability cases. Kreps v. Commissioner,351 F. 2d 1, 9 (2d Cir. 1965), affg. 42 T.C. 660 (1964); Stoumen v. Commissioner,27 T.C. 1014, 1019 (1957). However, it will make no difference which test of insolvency we use in this case--the answer will be the same. A creditor within the statute against fraudulent conveyances is one who has a legal claim or demand of a contractual nature existing when the conveyance is executed. But contingent creditors are as fully protected against fraudulent transfers as holders of absolute claims. Weathersbee v. Dekle,supra.The United States is deemed a creditor of the taxpayer from the date the obligation to pay income taxes accrues, Hatch v. Morosco Holding Co.,50 F. 2d 138, 139 (2d Cir. 1931); United States v. St. Mary,334 F. Supp. 799, 803 (E.D. Pa. (1971); United States v. 58th Street Plaza Theatre, Inc.,287 F. Supp. 475, 501 (S.D. N.Y. 1968). Because contingent creditors are protected against fraudulent conveyances under Florida law, the contingent unmatured tax liabilities are taken into account in determining whether *517 the effect of the conveyance was the hindrance or delay of creditors. Cf. United States v. St. Mary,supra.The full amount of the deficiency and addition to tax for the taxable year of transfer is included in determining whether the effect of the transfer was the hindrance or delay of creditors. Estate of Glass v. Commissioner,55 T.C. 543, 575 (1970), affd. per curiam 453 F. 2d 1375 (5th Cir. 1972); but see Alexander v. Commissioner,61 T.C. 278, 293-294 (1973); Powers Photo Engraving Co. v. Commissioner,17 T.C. 393, 399 (1951), remanded on other grounds 197 F. 2d 704 (2d Cir. 1952). With this guidance we turn to the cash gifts made to Jill by Harry and Gladys over the 4-year period 1968 through 1971. Those gifts, aggregating $686, made during 1969 through 1971, even though minimal and proceeding from a donative rather than a fraudulent intent, clearly resulted in the hindrance of the collection of the income tax liability accrued for 1967, 1968, and 1969. The evidence clearly indicates that the prior and current tax liabilities and additions to tax alone for each of those years greatly exceeded the Teplitzes' ability to pay them currently or at all with the value of the assets *518 held by them. The Teplitzes were insolvent from 1969 through 1971 under either the bankruptcy or equity test of insolvency, and the gifts further depleted the assets available to them to pay the deficient taxes. We have no doubt that under Florida law these transfers to Jill would come within section 726.01, Fla. Stat. Ann.
Respondent's assertion of transferee liability against Jill to the extent of $686 for the deficiencies and additions to tax at issue was proper. The $625 gift made at an unspecified time in 1968 by Gladys and the $500 gift from Harry on September 3, 1968, pose serious proof problems. Because we are not informed as to the date of the $625 gift, we cannot ascertain, as we are required to do, that the Teplitzes were indeed insolvent under either test of insolvency when this gift was made. Bluthenthal Stone Bros.,59 Fla. 161, 51 So. 851 (1910); Newcomb v. Commissioner,23 T.C. 954, 959 (1955); Stokes v. Commissioner,22 T.C. 415, 428-429 (1954). Any speculations with regard to when, in what sense of the word, and to what extent the Teplitzes were insolvent in 1968 are fruitless if we do not know when the $625 transfer was made. Respondent's failure to establish *519 the date of this gift makes it impossible to find that this gift would be considered a fraudulent conveyance under Florida law. Therefore, Jill is not liable as a transferee for the deficiencies and additions to tax to the extent of $625. With regard to the September 3, 1968, gift of $500 from Harry to Jill, it might make some difference whether the equity or bankruptcy test of insolvency is used. The gift was made subsequent to the mortgaging of the Teplitzes' residence on March 8, 1968. If the bankruptcy test of insolvency (liabilities exceed assets) is utilized, the Teplitzes were insolvent at the date of this transfer even without knowing whether Harry had yet misappropriated the steel from Cosid, Inc. However, if the equity test of insolvency (inability to pay current debts as they fall due) is utilized, we cannot determine that the Teplitzes were insolvent as of September 3, 1968, because the mortgages on the house and on the lots were obviously not due in single installments. Without knowing when in 1968 Harry misappropriated the steel we cannot find that the equity test of insolvency has been satisfied. [28] However, the evidence indicates that the $500 payment may have *520 been a repayment to Jill of a deposit she had made when she moved into the Teplitzes' apartment. Under the circumstances, we believe the Florida Supreme Court would apply the equity test of insolvency in determining whether this transfer of $500 to Jill was a fraudulent conveyance at the time it was made. Consequently, we find that Jill is not liable as a transferee for the deficiencies and additions to tax to the extent of this transfer. With regard to the gratuitous conveyance to Jill in 1973 of legal title to the condominium, her mother retaining possession, the burden remains upon respondent to establish that this action constitutes a fraudulent conveyance under Florida law. [29] *521 Gladys clearly was insolvent in 1973 under any definition of that term. Her only income was approximately $3,120 per annum. The value of the residence which she sold in 1973 was approximately $100,000. The income tax deficiencies and additions to tax determined for the years 1967 through 1969 greatly exceeded this annual income and the value of the residence. It is obvious that she could not have paid these debts at any time during 1973. Under these circumstances, the gratuitous conveyance of legal title to her condominium while she retained possession would be deemed a fraudulent conveyance under Florida law without the need to establish fraudulent intent, see Jones v. Wear, 111 Fla. 69, 149 So. 345 (1933); *522 Sarasota County v. Weeks, 100 Fla. 1064, 130 So. 599 (1930), if Jill had retained legal title to the condominium. We have held that a reconveyance to the transferor prior to the issuance of the statutory notice will negate transferee liability. However, we have also held that the burden of establishing that the reconveyance preceded issuance of the statutory notice is upon the transferee once respondent has sustained his burden that transferee liability exists under State law. Ginberg v. Commissioner, 35 T.C. 1148 (1961). While we have little doubt about Gladys' motive in placing title to the condominium in Jill's name, Jill did not occupy the premises and derived no benefit therefrom. She was simply a nominee of Gladys. The evidence reflects that title to the condominium was conveyed to Gladys "a month or two" after Jill's marriage in June 1975 for no consideration. The notice of deficiency and notices of transferee liability were sent to petitioners on September 12, 1975. While it is not definite that the reconveyance was made prior to issuance of the notices, we believe we are justified, under the circumstances, in concluding that Jill carried her burden of proving that it *523 did, and we so hold. The Florida statute, section 726.01, supra, provides that if a conveyance was in fraud of creditors, the transfer shall be "deemed * * * to be utterly void * * * and of none effect * * *" as against the creditors. The reconveyance of the property to Gladys accomplished the purpose of the statute, even if the original conveyance to Jill was considered fraudulent. The creditors, including respondent, may now look to Gladys for payment of the liabilities with the knowledge that her estate was not diminished by a transfer to Jill. Consequently, we again hold that Jill is not liable as a transferee for the deficiencies and additions to tax as a result of these transactions. Decisions will be entered under Rule 155. Footnotes
1. Respondent will not assert the addition to tax for fraud against Gladys.↩
2. All section references are to the Internal Revenue Code of 1954, as amended and in effect in the years in issue, unless otherwise specified.↩
2a. Respondent on brief has decreased the limit of Jill Wolk's liability as a transferee of the assets of the estate of Harry S. Teplitz and Gladys B. Teplitz, surviving spouse, to $49,311.↩
3. Respondent will not assert the additions to tax determined under sec. 6653(b) in docket No. 10222-75 against Gladys B. Teplitz, individually. The differences in the amounts of the deficiencies determined in the notice of deficiency and the notice of liability are due to utilization of different rates.↩
4. Stipulation of facts paragraph 9 is inconsistently and obscurely written. It states: "The petitioners agree that the Estate * * * is liable for the deficiencies in income tax and additions to tax as determined by the respondent in the notice of deficiency dated Sept. 12, 1975. However, the petitioners object to the disallowance by the respondent of $276,000 in purchases for the taxable year 1968, but do agree that the taxable income is properly increased by $276,000 in 1968 by adjustment b in the statutory notice of deficiency." In his opening statement counsel for respondent stated that the petitioners had conceded that the estate of Harry S. Teplitz is liable for the deficiencies in tax and additions to tax determined by respondent in the notice of deficiency. Counsel for petitioners did not dispute this statement.
5. The originals of these returns were not available but copies were received in evidence as stipulated exhibits. The copy of the 1964 return bears the signatures of Gladys B. Teplitz as well as that of Harry S. Teplitz. The copies of the returns for 1965 and 1966 are not signed.↩
6. These facts with respect to the gross income reported and received by Harry and Gladys and by Dodge Island are relevant to the innocent spouse issue, i.e., whether in excess of 25 percent of gross income was omitted from the returns.↩
7. This is the value placed on the misappropriated steel by Cosid and accepted by the revenue agent. We have no direct evidence that would prove a different value.
8. Street name means that the securities are held in the name of a nominee for ease of transfer. The shares are not registered in the owner's name and no certificate is established in the owner's name. Therefore, if one of the parties to the joint account wishes to sell a security held in street name, no endorsement is required of the owner.↩
9. At trial Gladys testified that the mortgage was $20,000. However, the documentary evidence indicates that $60,000 is the correct figure.↩
10. The record does not contain a complete list of deposits made to the joint checking account. It is not clear whether all of the checks drawn on Harry's individual accounts payable to Gladys were deposited in this account. From the summary of checks written by Gladys on this account, see infra,↩ most of Harry's checks must have been deposited or else Harry was giving Gladys additional cash.
11. Supplemental Stipulation of Facts paragraph 34 indicates that joint exhibit 19-S includes the total amount of checks drawn on this account for each year of the years listed. At trial, however, it was explained and stipulated that joint exhibit 19-S covers 8 months in 1968, 4 months in 1969, 3 months in 1970, and 11 months in 1971.
12. Although not personally knowledgeable as to Harry's motivation for the $500 gift to Jill, Gladys surmised that it resulted from Harry's decision to reimburse Jill the security deposit she had put down on the Teplitzes' apartment when she moved into it after the Teplitzes had acquired their home.↩
13. Sec. 1.6013-4(b), Income Tax Regs.↩
14. See infra↩.
15. The copies of the 1965 and 1966 returns which were received in evidence did not bear any signatures. However, they purported to be joint returns for Harry and Gladys.
16. See Estate of Ringler v. Commissioner,T.C. Memo. 1956-77↩.
17. The claims that Gladys did not file joint returns and that she is entitled to the protection of the innocent spouse provisions are inconsistent because sec. 6013(e)(1)(A)↩ requires the filing of a joint return. But since we have concluded that the returns for the years involved were joint returns, we will treat the innocent spouse claim as in the alternative.
18. Subparagraph (B) provides that "in signing the return" the other spouse did not know, and had no reason to know of, the omission from income. We have found that Gladys did not sign these returns. However, we believe it was the intent of Congress to extend these benefits to a spouse who otherwise meets the requirements of the statute who is treated as having filed a joint return whether that spouse signed the returns or not. Sec. 1.6013-5(a)(3), Income Tax Regs.↩, does not mention the words "in signing the return."
19. Since petitioners relied on their argument that the returns were not joint returns of Gladys, they did not discuss the innocent spouse issue in their original brief. Their discussion of the innocent spouse issue in their reply brief appears to be a reply to respondent's argument on this issue in his original brief and it is not clear just what their affirmative position is, despite the fact that they have the burden of proving compliance with all of the requirements of sec. 6013(e)(1)↩ in order to obtain relief as an innocent spouse.
20. Sec. 6013(e)(2)(B) provides that for purposes of section 6013(e)(1)↩ "the amount omitted from gross income shall be determined in the manner provided by sec. 6501(e)(1)(A)." 21. Sec. 6501(e)(1)(A) provides: (e) Substantial Omission of Items.--Except as otherwise provided in subsection (c)-- (1) Income taxes.--In the case of any tax imposed by subtitle A-- (A) General rule.--If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 percent of the amount of gross income stated in the return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 6 years after the return was filed. For purposes of this subparagraph-- (i) In the case of a trade or business, the term "gross income" means the total of the amounts received or accrued from the sale of goods or services (if such amounts are required to be shown on the return) prior to diminution by the cost of such sales or services; and (ii) In determining the amount omitted from gross income, there shall not be taken into account any amount which is omitted from gross income stated in the return if such amount is disclosed in the return, or in a settlement attached to the return, in a manner adequate to apprise the Secretary or his delegate of the nature and amount or such item. ↩
22. Sec. 6501(e)(1)(A)(i) - "* * * the term 'gross income' means the total of the amounts received or accrued from the sale of goods or services (if such amounts are required to be shown on the return) prior to diminution by the cost of such sales or services * * *." 23. This result is borne out by sec. 1.6013-5(d), Income Tax Regs., which states that sec. 6013(e)↩ applies to actual omissions from gross income and not to omissions resulting from erroneous or fraudulent deductions, claims, or other evasions or avoidances of tax. 24. We believe this answers petitioners' argument and we decline to engage in further speculation with regard to what was or was not reported as gross income on the joint return. We recognize that under James v. United States,366 U.S. 213 (1961), the value of the misappropriated steel is properly includable in gross income for 1968, but we cannot say with certainty that it was not included in the business income reported on the return. Respondent also argues that the gross receipts reported by Dodge Steel, a subchapter S corporation, should also be included in gross income reported for purposes of the 25-percent omission computation. We will leave this to be decided in a case where it is necessary. See Estate of Klein v. Commissioner,63 T.C. 585 (1975), affd. 537 F. 2d 701 (2d Cir. 1976), cert. denied 429 U.S. 980 (1976), and Roschuni v. Commissioner,44 T.C. 80 (1965). For reasons stated in our discussion of the year 1969, we do not believe Gladys would qualify for relief under either subparagraph (B) or (C) of section 6013(e)(1)↩.
25. Koufman v. Commissioner,T.C. Memo. 1976-330↩.
26. This decision obviates determination of Gladys' transferee liability for the years 1968 and 1969 asserted in the notice of liability, and Jill's transferee liability as a transferee of Gladys, transferee of the estate of Harry S. Teplitz. With regard to transferee liability for the deficiencies and additions to tax determined against Harry for 1967, we need not consider whether the innocent spouse provisions would protect Gladys from liability as transferee of Harry because there is insufficient evidence to prove that Harry was insolvent in 1967 or that Gladys was a transferee from Harry in that year. C.B.C. Super Markets, Inc. v. Commissioner,54 T.C. 882↩ (1970).
27. Section 6901(a)(1)(A)(i) provides: (a) Method of Collection.--The amounts of the following liabilities shall, except as hereinafter in this section provided, be assessed, paid, and collected in the same manner and subject to the same provisions and limitations as in the case of the taxes with respect to which the liabilities were incurred: (1) Income * * * taxes.-- (A) Transferees.--The liability, at law or in equity, of a transferee of property-- (i) of a taxpayer in the case of a tax imposed by subtitle A (relating to income taxes), * * *.↩
28. It appears that the entire value of the steel misappropriated in 1968 would have to be considered a current liability for that year because the terms of repayment were not established until 1969.↩
29. Nothing in the record indicates whether or not the condominium was homesteaded and therefore exempt from application of these debts. Sec. 222.01, Fla. Stat. Ann (West 1977) and Fla. Const. Art. 10, sec. 4(a)(1) exempt homesteaded property if the head of a family follows certain procedures. However, Gladys was not the head of the family as that phrase is defined under Florida law. To constitute a family there must be at least two persons living together as one family under the direction of one of them, who is recognized as head of the family. In re Estate of Van Meter,214 So. 2d 639 (Fla. App. 1968), writ discharged 231 So. 2d 524↩ (1970). Jill and Gladys did not live together in the condominium. Consequently, the condominium was not exempt from application of the tax deficiencies and additions to tax.